CITY OF EDGERTON and Edgerton Sand & Gravel, Inc., Plaintiffs-Respondents,†

v.

GENERAL CASUALTY COMPANY OF WISCONSIN, Defendant-Appellant-Petitioner,

WISCONSIN INSURANCE SECURITY FUND, Defendant,

AETNA CASUALTY & SURETY COMPANY, Defendant-Co-Appellant-Petitioner,

HANOVER INSURANCE COMPANIES, Wausau Insurance Companies and Local Government Property Insurance Fund, Defendants.

Supreme Court

*No. 91–1408. Oral argument November 29, 1993.—Decided June 16, 1994.*

(Also reported in 517 N.W.2d 463.)

† Motion for reconsideration filed July 5, 1994.

751

For the defendant-appellant-petitioner there were briefs by *Thomas N. Harrington, Heidi L. Vogt* and *Cooke & Franke, S.C.,* Milwaukee and oral argument by *Thomas N. Harrington.*

For the defendant-co-appellant-petitioner there were briefs by *Thomas R. Schrimpf, Susan R. Tyndall* and *Hinshaw & Culbertson,* Milwaukee and oral argument by *Thomas R. Schrimpf.*

For the plaintiffs-respondents there was a brief by *James A. Olson, Steven J. Schooler* and *Lawton & Cates, S.C.,* Madison and oral argument by *Steven J. Schooler.*

Amicus curiae brief was filed by *Paul R. Gurtler,* Dunn County Corporation Counsel, Menomonie for Wisconsin Association of County Corporation Counsels.

Amicus curiae brief was filed by *Robert C. Burrell* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee and of counsel *Thomas W. Brunner, Laura A. Foggan, Marilyn E. Kerst, John C. Yang* and *Wiley, Rein & Fielding,* Washington, DC for Insurance Environmental Litigation Association.

Amicus curiae brief was filed by *Eric Englund,* Madison for Wisconsin Insurance Alliance.

Amicus curiae brief was filed by *Joseph J. Muratore, Jr.* and *Law Offices of Joseph J. Muratore, S.C.,* Racine and of counsel *Thomas J. Dawson* and *Wisconsin Public Intervenor,* Madison and *Eugene R. Anderson, Robert M. Horkovich, Telma M. Grayson* and *Anderson, Kill, Olick & Oshinksy, P.C.,* New York, NY for Wisconsin Public Intervenor, Wisconsin's Environmental Decade, Samuels Recycling Company, Western Publishing Company, Inc., and S.C. Johnson & Son, Inc.

Amicus curiae brief was filed by *Thomas C. Ewing, Douglas B. Clark, Mark D. Kunkel* and *Foley & Lardner,* Madison for Wisconsin Policyholders Association.

Amicus curiae brief was filed by *Steven E. Tinker,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general, for the State of Wisconsin.

Amicus curiae brief was filed by *Curtis A. Witnyski,* Legal Counsel, Madison for the League of Wisconsin Municipalities.

Amicus curiae brief was filed by *David V. Meany* and *Michael, Best & Friedrich,* Milwaukee and of counsel *David M. Jones, John M. Edwards* and *Kirkpatrick & Lockhart,* Boston, MA for National Association of Chemical Recyclers, Wisconsin Fabricare Institute, Inc., Petroleum Marketers Association of Wisconsin, Association of Environmentally Responsible Businesses and Wisconsin Automobile and Truck Dealers Association.

Amicus curiae brief was filed by *Mark A. Dotson* and *Quarles & Brady,* Milwaukee and *Russell H. Carpenter, Jr., Saul B. Goodman, William F. Greaney, Adam M. Cole* and *Covington & Burling,* Washington, D.C. for The American Petroleum Institute, The American Fiber Manufacturers Association and The Chemical Manufacturers Association.

JANINE P. GESKE, J. This is a review of a published decision of the court of appeals, *City of Edgerton v. General Cas. Co.,* 172 Wis. 2d 518, 493 N.W.2d 768 (Ct. App. 1992), which affirmed in part and reversed in part a judgment of the circuit court for Rock County, John H. Lussow, Circuit Judge. The circuit court granted summary judgment to the plaintiffs, City of Edgerton (the City) and Edgerton Sand and Gravel, Inc. (ES&G). The City and ES&G sought a declaration of their rights under insurance policies issued by Gen-

eral Casualty Company of Wisconsin (General Casualty) and Aetna Casualty and Surety Company (Aetna).[1] The City and ES&G claimed that the policies provided coverage for environmental remediation costs resulting from the operation of a landfill located in the City. The circuit court agreed and granted the motion for summary judgment. The court of appeals reversed that decision.

General Casualty and Aetna filed cross-motions for summary judgment in the circuit court, claiming that (a) no suit seeking damages had been filed which would trigger a duty to defend, and (b) the failure of ES&G to provide notice of an occurrence or claim precluded coverage. The circuit court denied the cross-motions, and the court of appeals affirmed.

We now affirm the court of appeals decision with regard to the City's and ES&G's motion for summary judgment and reverse the court of appeals decision with regard to General Casualty's and Aetna's cross-motions for summary judgment.

Of paramount concern in this case is whether the insurance policies for which ES&G and the City con-

---

[1] Both the City and ES&G maintained insurance policies for personal injury liability from approximately 1973 to 1986. Specifically, ES&G received primary coverage from Iowa National Mutual Insurance Co. for the period of January, 1973 to January, 1984 (Iowa National is now insolvent). Primary coverage from January, 1984 to January, 1986 was provided by General Casualty. ES&G also maintained an excess coverage policy, issued by Aetna, from April, 1974 to April, 1977.

Iowa National also issued a primary coverage policy to the City for April, 1977 to April, 1981. That coverage was then carried by General Casualty from April, 1982 to April, 1986. Aetna did not issue a policy to the City at any time.

Both ES&G and the City agree that General Casualty's policies commencing *after* 1984 do not provide coverage.

tracted require a duty to defend against federal and state agencies' demands for environmental cleanup. Consequently, the following issues of first impression are before the court:

(1) Does the receipt of certain letters from a governmental agency requesting voluntary participation in environmental cleanup efforts constitute a "suit seeking damages" sufficient to trigger an insurance company's duty to defend?

(2) Do cleanup and remediation costs under CERCLA[2] and equivalent state statutes[3] constitute

[2] CERCLA, or the Comprehensive Environmental Response, Compensation and Liability Act of 1980, is also known as "Superfund" and was designed to provide for the cleanup of hazardous waste. The act empowered the federal government, through the Environmental Protection Agency (EPA), to identify hazardous waste sites and pursue remedial activities. As part of the remedial process, the government may perform the cleanup and seek compensation from responsible parties or require the polluters to do the cleanup.

Following the implementation of CERCLA in 1980, state legislatures enacted similar legislation which would apply to hazardous waste identified under the federal program, as well as reach to other substances that individual states had the need to control. *See* Howell A. Burkhalter, Comment, *Liability for CERCLA Cleanup Costs—Are Insurers the Victims of Judicial Activism?,* 26 Wake Forest L. Rev. 221, 222 n.8 (1991).

CERCLA was amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA) and is codified at 42 U.S.C. secs. 9601–9675 (1988 & Supp. 1992). This amendment served to buttress the original legislation.

Throughout this opinion, CERCLA will be cited as 42 U.S.C. sec. ———.

[3] Sections 144.43 to 144.79, Stats., comprise subch. IV of ch. 144 and focus upon solid waste, hazardous waste, and refuse. Specifically, secs. 144.442 and 144.443 establish the process for

"damages" within the context of a comprehensive liability insurance policy?

(3) Do the personal injury provisions of an insurance policy provide coverage for environmental cleanup costs when there has been no allegation of wrongful entry, eviction, or other invasion of the right to private occupancy?

(4) Is the "insured's own property" exclusion applicable so as to preclude coverage for cleanup and response costs incurred to remediate the insured's own property?

The threshold question in this case is whether the receipt by ES&G and the City of letters by the Wisconsin Department of Natural Resources (DNR), requesting remediation of a contaminated site, triggered General Casualty's and Aetna's duty to defend the City and ES&G as their insureds. The court of appeals concluded that the duty to defend arose when a federal or state environmental agency identified a potentially responsible party (PRP)[4] which it unequiv-

---

environmental repair and the financial responsibility associated with it. Various sections within this subchapter will be referred to in pertinent part throughout this opinion.

[4] 42 U.S.C. sec. 9622(e)(1) provides in pertinent part:

> Whenever the President determines that a period of negotiation under this subsection would facilitate an agreement with potentially responsible parties for taking response action (including any action described in section 9604(b) of this title) and would expedite remedial action, the President shall so notify all such parties . . ..

Once a PRP is notified of its status under this section, it has three options: (1) do nothing and wait for the government to recover the costs of the cleanup; (2) clean up the affected site or join with other PRPs to effect a cleanup; or (3) litigate with the government so as to possibly secure a more favorable future result. *See* Joanna L. Johnson, Comment, *Whether Insurers Must Defend PRP Notifications: An Expensive Issue Compli-*

757

ocally required to pay the cost of, or participate in paying the cost of, landfill remediation. *Edgerton,* 172 Wis. 2d at 530. However, the duty to defend is not triggered unless the suit seeks damages. *Id.* (citing *Shorewood School Dist. v. Wausau Ins.,* 170 Wis. 2d 347, 366, 488 N.W.2d 82 (1992)). Damages, according to the court of appeals, are remedial in nature, not preventive, and therefore do not encompass the cost of complying with an injunctive decree. *See Shorewood School Dist.,* 170 Wis. 2d at 370. Though General Casualty and Aetna argued that Superfund remediation and cleanup costs were incurred in response to claims for injunctive relief, the court of appeals concluded that the manner in which the term "damages" was used in the insurance policies at issue contemplated costs incurred when responding to the Superfund initiative.

We now hold that the DNR's notification to ES&G and the City by letter that ES&G and the City were potentially responsible parties and liable for hazardous waste site remediation costs does not trigger the insurers' duty to defend because the letters do not constitute a "suit seeking damages" within the plain meaning of the insurance policies contracted for and issued to ES&G and the City.

This holding makes it unnecessary for us to further analyze the personal injury and pollution exclusion provisions of the policies at issue.

The relevant facts are as follows. ES&G owns a landfill site in Rock County, consisting of approximately ten acres.[5] The site, located on the southern

---

*cated By Conflicting Court Decisions,* 10 N. Ill. U.L. Rev. 579, 581 n.8 (1990) [hereinafter *Whether Insurers Must Defend].*

[5] The site of the landfill was owned by the Sweeney family (owners of ES&G). From the early 1950's until the time of its closing in December of 1984, the landfill was used as a dump

border of the City, accommodated sand and gravel operations as well as serving as the City's landfill from 1968 to 1984.

By 1978, the DNR informed ES&G by letter that it suspected groundwater contamination at the site. The DNR recommended that the landfill be closed and capped. In 1984, volatile organic compounds (VOCs) were detected in the groundwater under and in the vicinity of the site. ES&G closed the landfill on December 30, 1984, and, during the next year, the site was capped.[6] Though the site was closed, groundwater contamination remained, and the DNR recommended the landfill for placement on the EPA's list of contaminated sites for priority cleanup.

On June 22, 1989, the EPA notified ES&G and the City by certified letter[7] that the EPA was investigating

---

and burn site for waste materials. From 1968 to 1984, the City of Edgerton leased the site for landfill operations. Licensing information indicates that the site was to be a depository for municipal waste, not hazardous or industrial wastes. However, ES&G and the City have claimed that sludge from the City's water treatment plant was also dumped at the site.

[6] "Capping" of the landfill required the construction of a clay cap, consisting of approximately two and one-half feet of clay material, over which was deposited six inches of topsoil. Ground cover was planted over the cap to ensure soil stability. Construction of the clay cap was done with DNR approval.

[7] The letter from the EPA stated the following in pertinent part:

> The United States Environmental Protection Agency (U.S. EPA) is presently investigating the circumstances surrounding the presence of hazardous substances in and around the Edgerton Sand & Gravel Site in Rock County. . ...

> Pursuant to the authority of Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. [sec.] 9604(e), amended by the Superfund

the circumstances surrounding the presence of hazardous substances in and around the landfill.[8] The EPA then requested that ES&G and the City (now considered PRPs) respond to the DNR's request for information regarding the disposal of hazardous substances at the landfill from 1950 to 1984.

In July, 1989, both the City and ES&G forwarded the letters received from the EPA to their primary carrier, General Casualty. Each separately requested defense coverage. ES&G specifically requested that General Casualty pay any costs which ES&G may have incurred regarding the site.

In February, 1990, the DNR sent certified letters to the City and ES&G, giving each 30 days to propose a plan for remediation of the site and any problems associated with it.[9] Failure to respond would result in the

Amendments and Reauthorization Act of 1986, Pub. L. 99–499 [SARA], and pursuant to Section 3007 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. [sec.] 76927, you are hereby requested to respond to the following Information Requests. Compliance with the following Information Requests is mandatory.
. . .

The information requests focused upon the City's and ES&G's possession, custody or control relating to the operation/cleanup of the landfill and to the storage and/or disposal of hazardous substances at the site.

[8] This course of action by the EPA was pursuant to 42 U.S.C. sec. 9604(e).

[9] In its letter, the DNR stated that the remediation plan must comprehensively describe the actions required to determine the extent of the contamination and to remediate it in accordance with state regulations. The plan must also follow the guidelines established by the EPA.

Section 144.442, Stats., outlines actions to be taken regarding environmental repair. Section 144.442(8) specifically articulates how the Superfund act shall be implemented in the state:

**(8) IMPLEMENTING THE FEDERAL SUPERFUND ACT.** (a) The department [of natural resources] may advise, consult, assist and contract with other interested persons to take action to implement the federal comprehensive environmental response, compensation and liability act of 1980, 42 USC 9601, et seq., in cooperation with the federal environmental protection agency. These actions include all of the actions under subs. (4) to (6). The department may enter into agreements with the federal environmental protection agency.

(b) The department may expend moneys from the appropriations under ss. 20.370(2)(dv) and 20.866(2)(tg) as required under 42 USC 9601, et seq. The department shall promulgate by rule criteria for the expenditure of moneys from the appropriations under ss. 20.370(2)(dv) and 20.866(2)(tg). The criteria shall include consideration of the amount of moneys available in the appropriations under ss. 20.370(2)(dv) and 20.866(2)(tg), the moneys available from other sources for the required sharing of costs, the differences between public and private sites or facilities, the potential for cost recovery from responsible parties and any other appropriate factors.

(c) 1. The department may require a municipality to pay a reasonable share of the amount expended by the department for a project under par. (b). The department shall base any share charged to a municipality for a project under par. (b) on the following factors:

a. The municipality's responsibility for the site or facility affected by the project.

b. The benefit that the municipality receives from the project.

c. The municipality's ability to pay for the project.

2. The total amount charged to all municipalities who are charged for the project may not exceed 50% of the amount expended by the department under par. (b) for the project.

3. The department shall promulgate rules establishing criteria for determining the responsibility, for the purposes of this subsection, of a municipality for a site or facility affected by the project under par. (b); the benefit a municipality receives from a project under par. (b); and the ability of a municipality to pay for a project under par. (b).

4. All moneys received under this paragraph shall be credited to the environmental fund for environmental repair.

(NPL), or state action.[10] By April, 1990, ES&G notified Aetna, its excess insurer, of the receipt of the EPA information request letter and the DNR enforcement letter. Again, ES&G requested coverage of defense costs as well as any liability resulting from EPA or DNR claims. General Casualty denied coverage and a defense for the City and ES&G. Aetna denied the same for ES&G.

Both the City and ES&G, in a declaratory action begun in December, 1990, sought to define the obligations of General Casualty and Aetna under the insurance policies. Specifically, both the City and ES&G claimed that General Casualty and Aetna were obligated to defend and indemnify them for any liability arising out of DNR or EPA claims, actions, or suits involving the landfill. Additionally, ES&G and the City stated a claim for bad faith against General Casualty and Aetna for refusing to provide a defense. A motion for summary judgment was filed by the City and ES&G in March, 1991. In April, 1991, General Casualty filed a cross-motion for summary judgment which stated that (a) since no "suit seeking damages" had been filed, no duty to defend was triggered; (b) the insured's failure to give timely notice of an occurrence or claim precluded coverage under the policies; and (c) the bad faith claim ought to be dismissed. Aetna filed a similar cross-motion for summary judgment.

In May, 1991, the circuit court granted the City's and ES&G's motion for summary judgment and denied the cross-motions. However, the court did dismiss the bad faith claim.[11] In July, 1991, the circuit court

---

[10] The work plan was prepared and then filed July 11, 1991, in the DNR's southern district headquarters.

[11] Both General Casualty and Aetna moved the circuit court, as an alternative to their cross-motions for summary

entered an amended judgment from which General Casualty and Aetna appealed.

The court of appeals affirmed that part of the judgment which denied the insurers' cross-motions for summary judgment and reversed that part of the judgment which granted ES&G's and the City's motion for summary judgment. The court of appeals concluded that (a) the insurers' duty to defend was not triggered by the PRP letters from the EPA in June, 1989, but was triggered by the receipt of the letters from the DNR in February, 1990; (b) the DNR letters unequivocally imposed upon the City and ES&G responsibility to remediate and clean up the landfill or to bear the cost of the remediation which necessitated a defense by the insurers; and (c) remediation costs are damages within the meaning of the term in the policies.

Summary judgment under sec. 802.08(2), Stats.,[12] shall be rendered when no genuine issue as to any material fact exists, and the moving party is entitled to a judgment as a matter of law. Summary judgment

judgment, to order a continuance so as to permit additional discovery. The circuit court ultimately did not rule on the motions for a continuance, and the court of appeals decision rendered moot each insurer's claim that the circuit court erroneously exercised its discretion by not addressing those motions.

[12] Section 802.08(2), Stats., provides:

**802.08 Summary judgment. . . .**

(2) *Motion.* . . . The judgment sought shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

should not be granted "unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy . . .." *Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). A party seeking summary judgment must, therefore, demonstrate to the court that a trial is unnecessary by establishing a record which sufficiently illustrates that no triable issues of material fact exist on any issue presented. *Heck & Paetow Claim Service, Inc. v. Heck,* 93 Wis. 2d 349, 356, 286 N.W.2d 831 (1980) (citing *Hilkert v. Zimmer,* 90 Wis. 2d 340, 342, 280 N.W.2d 116 (1979)). If the movant's papers before the court do not clearly establish the absence of such a material fact, the court shall deny the motion. *Grams,* 97 Wis. 2d at 339.

On appeal, this court must review the grant or denial of a summary judgment motion by applying the standards set forth in sec. 802.08, Stats., just as the circuit court is to apply them. *Voss v. City of Middleton,* 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991) (citing *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987)).

## DUTY TO DEFEND

Every insurance agreement functions as a contract between the insured and the insurer. Each party to the contract owes certain duties and obligations to the other. The issue in this case is not, as the dissent infers, "Who will pay the costs of environmental cleanup?", but is one of interpretation of the insurer's contractual duties. The insurer maintains two obligations, the duty to indemnify the insured in the event of a loss and the duty to defend the insured against suits which fall under the terms of the policy. *See* Mitchell L. Lathrop,

764

*Insurance Coverage for Environmental Claims* sec. 8.03[1][a] at 8–24 (1994). The duty to defend "is predicated on allegations *in a complaint* which, if proved, would give rise to recovery under the terms and conditions of the insurance policy." *Elliott v. Donahue,* 169 Wis. 2d 310, 320–21, 485 N.W.2d 403 (1992) (emphasis added) (citing *Sola Basic Industries, Inc. v. U.S. Fidelity & Guaranty Co.,* 90 Wis. 2d 641, 646, 280 N.W.2d 211 (1979)). As the court of appeals stated in *Nichols v. American Employers Ins. Co.,* 140 Wis. 2d 743, 749, 412 N.W.2d 547 (Ct. App. 1987):

> The duty to defend exists independent of the duty to investigate. Indeed, a duty to defend does not even arise until there has been a suit initiated. *See Solo Cup Co. v. Federal Ins. Co.,* 619 F.2d 1178, 1183 (7th Cir. 1980) *cert. denied* 449 U.S. 1033 (1980). As *Sola Basic* points out, once the suit is initiated, the insurer must make a determination of whether it is obligated to defend the suit. The determination is made based upon the allegations in the third party's complaints.

The language of the policy issued by General Casualty states that the company maintains the "right and duty to defend *any suit* against the insured *seeking damages . . . .*" (Emphasis added.) Aetna's excess insurance policy for ES&G similarly states that the company will "defend *any suit seeking damages* which are not payable on behalf of the insured under the terms of the policies of Underlying Insurance . . . .*" (Emphasis added.) Neither policy requires the insurance companies to defend against a "claim" made against an insured. The only duty imposed on the insurers is to defend against suits seeking damages from the insureds.

Therefore, in order to determine whether the insurance companies have a duty to defend in this case, we must decide whether there is a suit seeking damages against the insureds.

## WHAT CONSTITUTES A "SUIT"?

The expansive authority granted to state and federal agencies under CERCLA, in order to initiate environmental cleanup of hazardous waste, has had the effect of producing a flood of litigation so as to determine who will pay the cleanup costs—the PRP or the PRP's insurer. Though comprehensive analyses of insurance policy language and policy drafting records have been performed by courts across the country, there has been no definitive, nationwide resolution of the ultimate issue—whether the general comprehensive liability policy—the "CGL"—imposes a duty to defend a federal or state demand for environmental remediation and cleanup costs.[13] Instead, courts have

---

[13] A majority of courts *have not* conclusively determined that a CGL imposes a duty to defend following the receipt of a PRP letter. Rather, courts have been very divided on this issue when analyzing (a) the nature and timing of the acts which give rise to a pollution-related problem; (b) the role the CGL insured plays in those acts; and (c) the nature of the relief sought against the CGL insured. *See* Barry R. Ostrager, *Special Insurance Coverage Issues Arising Out of Hazardous Waste/Environmental Clean-Up Litigation,* American Law Institute (1993). Further, one must carefully distinguish among the issues raised in this type of environmental litigation, in addition to the duty to defend: the role of the pollution exclusion clause, the scope of CGL coverage for environmental claims, and coverage under the personal injury endorsement. Again the split among the courts is far more self-evident than a majority view.

For example, the following is a partial list of decisions which have held that a duty to defend was invoked with the issuance of a PRP letter: *Village of Morrisville Water & Light Dept. v. USF&G,* 775 F. Supp. 718 (D. Vt. 1991) (the EPA clearly warned the insured of the probability of imminent government action, enforceable by a court of law, if it did not respond to the letter; the PRP letter is the equivalent to the start of a lawsuit); *Avondale Industries, Inc. v. Travelers Indem. Co.,* 697 F. Supp. 1314 (S.D. N.Y. 1988), *aff'd* 887 F.2d 1200 (2d Cir. 1989), *reh'g denied* 894 F.2d 498 (2d Cir. 1990), *cert. denied* 496 U.S. 906 (1990) (an action may be taken which binds the insured before a suit is filed; since damages may be determined before the parties arrive in court, the administrative process is part of the litigious process which triggers the obligation to defend); *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.,* 662 F. Supp. 71 (E.D. Mich. 1987) (the duty to defend is not restricted to the traditional lawsuit for money damages, but extends to the actual or threatened use of the legal process to coerce payment); *Hazen Paper v. U.S. Fidelity and Guar.,* 407 Mass. 689, 555 N.E.2d 576 (1990) (though literally there is no suit, the litigation defense protection purchased by Hazen would be compromised if USF&G did not defend in response to the EPA letter); *Minnesota Min. & Mfg. v. Travelers Indem.,* 457 N.W.2d 175 (Minn. 1990) (the issue of coverage does not depend merely on the form of action taken against the insured; the proceeding commenced is equally as coercive as a civil judgment against the insured); and *Cascade Pole Co. v. Reliance Insurance Co.,* No. 88–2–2316–3 (Wash. Super. Ct. March 20, 1992) (a PRP letter is a suit because remediation and response costs may be incurred and because they establish adversarial relationships).

The following decisions have held that a PRP letter does not trigger the duty to defend under a CGL policy: *Harter Corp. v. Home Indem. Co.,* 713 F. Supp. 231 (W.D. Mich. 1989) (the court cannot construe an EPA threat to hold the insured liable for cleanup costs as a suit seeking damages without doing violence to the plain meaning of the word "suit"); *State of N.Y. v. Amro Realty Corp.,* 697 F. Supp. 99 (N.D. N.Y. 1988) (there is no duty

developed competing definitions of what constitutes a "suit" when environmental cleanup is required.

The CGL, which emerged onto the insurance industry scene in the early 1940's, provided broad, comprehensive insurance and served as a replacement for specific risk policies. *See* Paul V. Majkowski, Note, *Triggering the Liability Insurer's Duty to Defend in Environmental Proceedings: Does Potentially Responsible Party Notification Constitute a "Suit"?*, 67 St. John's L. Rev. 383, 384 n.3 (1993).[14] The duty to defend clause

to defend until an actual complaint in an environmental lawsuit is forwarded to the insurer); *Detrex Chem. Industries v. Emp. Ins. of Wausau,* 681 F. Supp. 438 (N.D. Ohio 1987), *modified on reh'g* (applying Wisconsin law), *reaff'd* 746 F. Supp. 1310 (N.D. Ohio 1990) (applying Michigan law) (a claim for damages made against the insured that might result in liability is not synonymous with a suit and not enough to trigger the duty to defend); *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16 (Me. 1990) (no obligation to defend since the attorney general had not sued for cleanup costs; an administrative arena to compel cleanup was merely sought); and *Technicon Electronics v. American Home,* 141 A.D.2d 124 (N.Y. App. Div. 1988), *aff'd on other grounds* 542 N.E.2d 1048 (1989) (the PRP letter does not constitute a suit).

[14] As Mr. Majkowski notes in his article, insurance industry trade organizations produced a standard CGL form following a series of drafts from 1941 to 1973. Coverage as of 1966 was provided for any "occurrence" as opposed to "accidents." "Occurrence" was defined as " 'an accident, including *injurious exposure to condition,* which results [in injuries or damages] . . . neither expected nor intended from the standpoint of the insured. . . .' " (Emphasis added.) During the period of these revisions, coverage was expanded and included pollution claims. However, by 1986, the insurance industry drafted a more strict CGL form in order to limit coverage of various pollution claims. *Id.* Disputes under the stricter CGL forms focus on

in most CGL policies beginning in 1973 stated that "the company shall have the right and duty to defend any suit against the insured seeking damages on account of such [covered] bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ." *See* Donald E. Sharpe & Jean K. Shaffer, *The Parameters of an Insurer's Duty to Defend,* 19 Forum 555, 556 (1984).[15] The specific language in the comparable clause of the General Casualty policy at issue in this case reads in pertinent part:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> A. bodily injury or
> B. property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend *any suit against the insured seeking damages* on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the com-

the meaning of "damages" and absolute pollution exclusion provisions.

[15] The interpretation of the CGL regarding potential coverage for PRP notification letters has posed problems for courts across the country. The PRP notification describes a form of liability not compatible with pre-1980 policy language. As a result of CERCLA, a new type of remedy has come into being: combining monetary relief with site cleanup. Additionally, fines may be assessed which were not historically contemplated by a CGL insurer. *See* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* sec. 8.03 (1991); *see also Whether Insurers Must Defend,* 10 N. Ill. U.L. Rev. at 582.

> pany shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

(Emphasis added.)

When ES&G and the City responded to the EPA and DNR letters, both were involved in an administrative procedure pursuant to CERCLA. Therein lies the heart of the dispute: does the duty to defend in a CERCLA proceeding arise at this administrative level? The controversy is further complicated by the fact that CERCLA was designed to have an anti-litigation bias. 42 U.S.C. sec. 9622(a) states that "[w]henever practicable . . . [the EPA] shall act to facilitate [settlement] agreements . . . in order to expedite effective remedial actions and minimize litigation." Therefore, notice letters have been used by the EPA as a primary method to effect voluntary settlements with PRPs. However, if a PRP chooses to ignore the notice letter, it may face liability for recovery costs into the tens of millions of dollars resulting from EPA-initiated cleanup.

Some courts have concluded that PRP letters have a unique nature within the context of a CERCLA administrative proceeding. These courts have held that the receipt of PRP letters is the "functional equivalent of a suit" because (a) the letters maintain a confrontational and adversarial posture, and (b) they create the spectre of devastating financial consequences if voluntary cooperation is not forthcoming. As a result, PRP liability for immediate and long-range cleanup and remediation costs necessitates a legal defense.[16]

---

[16] Requests to insurers for a defense are often made in conjunction with a reimbursement request for the following: (a) the retention of environmental consultants; (b) the formulation and implementation of remedial work plans; and (c) investigation

We conclude that neither a PRP letter nor a comparable notification letter by a state agency such as the DNR triggers the insurers' duty to defend. Though the court of appeals was correct when it concluded that the PRP letters to the City and ES&G did not trigger the insurers' duty to defend, it should have arrived at the same conclusion regarding the DNR letters. Those letters stated in pertinent part:

> On November 6, 1989, the Department forwarded to you the CERCLA 104(a) responses it received as part of a potential responsible party (PRP) search for the Edgerton Sand and Gravel landfill site. These responses were forwarded to you as part of a joint effort to begin remediation of the known environmental impacts from the site. To date the Department has not received any progress reports on your efforts to arrange for a PRP clean up of the landfill. In our November 6, 1989, letter the Department stated that failure of the PRP's to reach agreement on a clean up plan would force the

costs. *See Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp.,* 948 F.2d 1507 (9th Cir. 1991); *Ray Industries, Inc. v. Liberty Mut. Ins. Co.,* 728 F. Supp. 1310 (E.D. Mich. 1989), *rev'd in part, reh'g denied* 974 F.2d 754 (6th Cir. 1992); *Avondale Industries, Inc. v. Travelers Indem. Co.,* 697 F. Supp. 1314 (S.D. N.Y. 1988), *aff'd* 887 F.2d 1200 (2d Cir. 1989), *reh'g denied* 894 F.2d 498 (2d Cir. 1990), *cert. denied* 496 U.S. 906 (1990) (receipt of a PRP letter could have immediate adverse consequences for the insured, and the administrative process is part of a "litigious process" that triggers the duty to defend); *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.,* 662 F. Supp. 71 (E.D. Mich. 1987) (coverage does not hinge on the form of the action taken or the nature of the relief sought); and *Minnesota Min. & Mfg. v. Travelers Indem.,* 457 N.W.2d 175 (Minn. 1990).

Department to pursue having the site included on the Superfund National Priorities List (NPL).

The environmental problems associated with this site dictate that remediation work begin soon. Consequently, the Department will allow you only another 30 days from the date of this letter to propose a PRP implemented remediation work plan. . . .

The work plan must contain a detailed discussion of the tasks to be performed and a timeline for the tasks to occur. . . . Also, a legally enforceable contract between the Department and the PRP's must be signed within 60 days after a PRP workplan is submitted to the Department, to ensure that the work is completed properly and on schedule.

The DNR then went on to state that if an acceptable work plan was not submitted by the deadline date, it would pursue the following action: (a) an attempt to have the landfill listed on the NPL as quickly as possible and (b) legal action under state authorities to have the site investigated and cleaned up. The DNR also referred to statutory authority under secs. 144.43 to 144.79, Stats., by which the DNR could order the City and ES&G to remediate damage caused by the landfill.[17]

---

[17] In sec. 144.01, Stats., the following applicable terms are defined: "environmental pollution," "hazardous substance," "solid waste," and "owner."

Subchapter IV of ch. 144 focuses upon solid and hazardous waste management and cleanup. Specifically, sec. 144.431 gives the DNR the following powers and duties regarding solid waste:

**144.431 Solid waste; powers and duties. (1)** The department shall:

(a) Promulgate rules implementing and consistent with ss. 144.43 to 144.47.

(b) Encourage voluntary cooperation by persons and affected groups to achieve the purposes of ss. 144.43 to 144.47.

(c) Encourage local units of government to handle solid waste disposal problems within their respective jurisdictions and on a regional basis, and provide technical and consultative assistance for that purpose.

(d) Collect and disseminate information and conduct educational and training programs relating to the purposes of ss. 144.43 to 144.47.

(e) Organize a comprehensive and integrated program to enhance the quality, management and protection of the state's land and water resources.

(f) Provide technical assistance for the closure of a solid waste disposal facility that is a nonapproved facility, as defined in s. 144.441(1)(c).

(2) The department may:

(a) Hold hearings relating to any aspect of the administration of ss. 144.43 to 144.47 and, in connection therewith, compel the attendance of witnesses and the production of evidence.

(b) Issue orders to effectuate the purposes of ss. 144.43 to 144.47 and enforce the same by all appropriate administrative and judicial proceedings.

(c) Secure necessary scientific, technical, administrative and operational services, including laboratory facilities, by contract or otherwise.

(d) Advise, consult, contract and cooperate with other agencies of the state, local governments, industries, other states, interstate or interlocal agencies, and the federal government, and with interested persons or groups.

(e) Inspect solid waste facility construction projects to determine compliance with ss. 144.43 to 144.47 and rules promulgated and licenses issued under those sections.

Section 144.442, Stats., focuses upon environmental repair. Specifically, sec. 144.442(4) provides the DNR with the authority to conduct investigations of sites or facilities which pose an environmental pollution hazard. It is under this section that the DNR identifies PRPs. Section 144.442(5) authorizes the DNR to promulgate rules under which remediation plans are established. Section 144.442(6) provides the DNR with authority to take action for the purpose of environmental repair. Finally, under sec. 144.442(8) the DNR may take action to implement CERCLA by means of advising, consulting, assisting, and contracting with other interested parties.

Neither letter has the attributes of a "suit." *See Detrex Chem. Industries v. Emp. Ins. of Wausau,* 681 F. Supp. 438, 446 (N.D. Ohio 1987) ("[A] claim for damages made against [the insured] that *might* result in its legal liability is not synonymous with a 'suit' so as to trigger [the insurer's] duty to defend . . ..") (Emphasis added.)[18] This court has recently examined the attributes of a "suit" in *State v. P.G. Miron Const. Co., Inc.,* 181 Wis. 2d 1045, 512 N.W.2d 499 (1994), wherein we defined "suit" as

> 'any proceeding by one person or persons against another or others *in a court of law* in which the plaintiff pursues, *in such court,* the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or equity.'

*Miron,* 118 Wis. 2d at 1053 (quoting *Black's Law Dictionary* 1434 (6th ed. 1990)) (emphasis added in *Miron*)

[18] It should be noted that the court in *Detrex* stated in dicta that the duty to defend would be triggered by a cost recovery action, an action for injunctive relief, or a state administrative proceeding in which a state agency was performing traditional judicial activities, thereby acting in a judicial capacity. Specifically, the court stated, "Until, pursuant to Section 9606, the EPA resorts to a court injunction or to a mandatory court order to enforce a section 9606(a) administrative order, . . . a 'suit' would not be brought against [the insured] that would trigger [the insurer's] duty to defend." *Id.* None of the above actions occurred in the instant case. Rather, correspondence from the EPA was confined to information requests, at the early stages of the PRP compliance process. The DNR, in correspondence dated February, 1990 and February, 1991, detailed what action *may* be taken if a remediation work plan was not forthcoming from the City and ES&G. Neither letter identified any *legal* action which had already been initiated.

(the use of arbitration under a contract between a private party and the state does not violate the doctrine of sovereign immunity because arbitration does not subject the state to suit). Thus, the primary attribute of a "suit" is that parties to an action are involved in actual court proceedings, initiated by the filing of a complaint. Despite the dissent's attempt to expand the definition of the word "suit," definitions of suit or legal process all involve a court action.[19] The clearest example of this is the fact that the parties to the instant case were made part of a "suit" when a declaratory action was begun to identify General Casualty's and Aetna's obligations under the insurance policies.

Rather than initiating a suit, the letters from the EPA and the DNR to General Casualty and Aetna were used to gather information regarding hazardous substances at the site, as well as to call for voluntary action by the City and ES&G in the process of cleanup.[20] The

---

[19] For example, *Black's Law Dictionary* defines "legal proceedings" as follows:

> **Legal proceedings.** Term includes all proceedings authorized or sanctioned by law, and brought or instituted in a court or legal tribunal, for the acquiring of a right or the enforcement of a remedy.

*Black's Law Dictionary* 896 (6th ed. 1990).

"Process" has also been defined as "[t]he entire course of a judicial proceeding." *The American Heritage Dictionary of the English Language* 1444 (3d ed. 1992).

[20] *See Technicon Electronics v. American Home,* 141 A.D.2d 124 (N.Y. App. Div. 1988), *aff'd on other grounds* 542 N.E.2d 1048 (1989). The court concluded that "[t]he EPA letter at issue merely informed Technicon of its potential liability under CERCLA and that the EPA was interested in discussing Technicon's voluntary participation in remedial measures. The letter was an invitation to voluntary action on Technicon's part and is not the equivalent of the commencement of a formal proceeding

court of appeals concluded that additional correspondence in February, 1991, from the DNR's Bureau of Legal Services moved the proceedings beyond the information-gathering stage. Specifically, the court referred to the following language of the letter:

> WDNR intends to pursue listing of this site on the NPL unless potentially responsible parties (PRPs) for the site enter into a contract with WDNR to undertake investigation and clean-up activities. . . .

> The purpose of this letter is to notify you that unless a PRP group signs a contract with WDNR for this site by May 31, 1991, WDNR will request that this site be listed on the NPL. . . . For NPL sites, U.S. EPA adheres to a very strict timeframe for negotiation of Administrative Consent Orders. These Consent Orders generally require, among other things, strict compliance with the NCP [National Contingency Plan], reimbursement of agency oversight costs . . . liquidated damages for non-compliance and the potential for treble damages. If the negotiation of a Consent Order is not successful, U.S. EPA may issue an Order requiring the PRPs undertake specific action or undertake the action and sue to recover its costs from the PRPs. U.S. EPA may seek forfeitures for non-compliance and treble damages may also be available.

Indeed, this correspondence indicates that there was some movement beyond the fact-gathering stage. However, there was no movement into the realm of a suit. The correspondence served to inform the PRPs of action which may be pursued, *or not,* depending upon the response by the City or ES&G. This letter cannot be

within the meaning of the subject comprehensive general liability policies." *Technicon,* 141 A.D.2d at 146.

considered the equivalent of a service of process so as to initiate a suit.

However, the court of appeals adopted the reasoning of *Ryan v. Royal Ins. Co. of America,* 916 F.2d 731 (1st Cir. 1990),[21] in which the court articulated a four-part test to determine if a PRP letter was the "functional equivalent of a suit": (a) the letter's coerciveness; (b) the letter's adversariness; (c) the seriousness of effort with which the government hounds an insured; and (d) the gravity of the imminent consequences. *Id.* at 741. The court of appeals then concluded that the EPA and the DNR had assumed an adversarial approach toward the City and ES&G and that devastating financial consequences would result from a failure to enter into the requested contract. Therefore, there existed a degree of compulsion which necessitated a defense.

We disagree with the conclusion of the court of appeals. Though the tone of the correspondence may be termed confrontational, neither the EPA's PRP letters nor the DNR letters *by themselves* impose liability. Also, if the City or ES&G failed to respond to the letters, that failure alone would not authorize the assessment of fines. Instead, something more in the form of a court proceeding would be required to *"force or compel* the insured to take action or suffer serious

---

[21] In *Ryan,* the court noted that the owner of a contaminated site had a somewhat desultory correspondence with the New York Department of Environmental Conservation regarding the closure and cleanup of the affected site. Ryan sued his insurer, Royal Insurance, for failure to defend and indemnify under the policies. At issue was whether the correspondence between Ryan and the Department of Conservation, regarding contamination and cleanup, was the functional equivalent of a suit sufficient to trigger the insurer's duty to defend.

consequences." *See Professional Rental v. Shelby Ins.*, 75 Ohio App. 365, 375, 599 N.E.2d 423, 430 (1991) (emphasis in original). For example, the EPA could issue, and then seek to have enforced, an administrative order pursuant to 42 U.S.C. sec. 9606(a) or 9604(e)(5)(A);[22] it could seek an injunctive order in federal district court under 42 U.S.C. sec. 9606(a);[23] or it could initiate a cost recovery action under 42 U.S.C. sec. 9607.[24] *Id.* Indeed, the February 8, 1991, letter from the DNR stated that if the City and ES&G did not sign the proposed contract and the site was listed on the NPL, primary responsibility for cleanup activities

---

[22] Though the EPA encourages voluntary participation in the cleanup and remediation efforts by means of PRP notification letters, it is authorized under 42 U.S.C. sec. 9606(a) to issue administrative orders to compel a PRP to clean up a site. The EPA may negotiate the administrative order with the PRP; if successfully done, it becomes a binding consent order. If the negotiations fail, the EPA may then unilaterally develop the administrative order, which has the effect of accelerating compliance, since a fine of $25,000 is imposed for each day the PRP does not comply. 42 U.S.C. sec. 9606(b)(1).

[23] Under 42 U.S.C. sec. 9606(a), the EPA may seek an injunctive order, through the Department of Justice, in order to compel a PRP to comply with the cleanup plan.

[24] If a PRP decides not to respond to the PRP letter or does not participate in cleanup operations, the federal government may, under CERCLA, use Superfund money to clean up the site and then seek reimbursement from any responsible party. *See* 42 U.S.C. secs. 9604(a)(1) and 9607(a).

Again, the legislative bias in CERCLA is to seek voluntary settlement and cleanup. However, the EPA may also force the government to order a cleanup, or request the government to unilaterally implement cleanup, followed by litigation wherein reimbursement is sought. *See Professional Rental,* 75 Ohio App. at 373–74, 599 N.E.2d at 428–29.

would shift to the EPA. If that had occurred, then the EPA administrative orders may come into play. Prior to that time, the DNR offered the City and ES&G options under which all concerned parties might cooperate in order to clean up and remediate the landfill.[25] None of the options offered by the DNR rose to the level of a court proceeding.

If the EPA's conduct in sending the PRP letter or the DNR's letter requesting site remediation is construed as initiating a "suit seeking damages," the duty to defend would be mandated under the terms of the policy. Such a result would create a duty for the insurer for which it had not contracted.[26] This court has stated

---

[25] The court in *Professional Rental* noted the following regarding PRP notifications:

> The CERCLA notification process is clearly not analogous to the traditional means of bargaining and settlement. 'Settling' with the EPA primarily involves formulating an acceptable proposal for cleaning up the pollution under the assumption of PRP liability. Although the EPA designates recipients as 'potentially responsible parties,' it is not the equivalent of a conventional demand letter or a simple accusation of fault. First, PRP notifications are sent after the EPA has established that 'there is sufficient evidence to make a preliminary determination of potential liability under section 107 of CERCLA.' Superfund Program, 53 F.R. at 5301. Second, parties who are simply 'identified' as responsible under Section 107(a) are strictly liable, regardless of fault. The only defense (other than an act of God or war) is the limited defense of 'due care' provided in CERCLA Section 107(c)(3) . . ..

*Professional Rental,* 75 Ohio App. at 374, 599 N.E.2d at 429.

[26] More importantly, it is an obligation for which an insurer may not be prepared. Typically, insurers assess the extent of the risks insured under policies issued. The risk of liability may then be spread among groups of insureds and premiums assigned only after the extent of the risk is determined: The original risk assessment becomes a nullity if the language of the policy is redefined in order to expand coverage beyond what was

that a primary goal in interpreting insurance policies is to ascertain and carry out the true intentions of the parties. *See Kremers-Urban Co. v. American Employers Ins.,* 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). As a result, the words of a policy are to be given their plain and ordinary meaning. *Id.* The meaning of the terms of the policy is assessed by a reasonable person in the position of the insured and that reasonable insured's expectations of coverage. *Id.* However, an insured's expectations may not be satisfied in contradiction to policy language which clearly identifies the scope of the insured's coverage. Thus, "[w]here the parties have contracted to limit recovery to a specific quantifiable type of remedy, a court should not alter the insurance contract to include other types of remedies not con-

---

planned for by the insurer in the contract of insurance. Policies of insurance, premised upon a certain level of predictability and assessment of risk at the time of contracting, lose their effect without the inclusion of certain basic definitions. *See Whether Insurers Must Defend,* 10 N. Ill. U.L. Rev. at 595; Kenneth S. Abraham, *Distributing Risk: Insurance, Legal Theory, and Public Policy* 103 (1986); 2 *Couch on Insurance 2d* sec. 15:4 (2d ed. 1984); *U.S. Fidelity and Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31, 33 (6th Cir. 1988) (insurers need to rely on policy language in order to efficiently manage risks) (citing *United States Fire Ins. v. Kentucky Truck Sales,* 786 F.2d 736, 739 (6th Cir. 1986) ("[T]he court must give all terms their plain meanings and *not rewrite an insurance contract to enlarge the risk.*") (Emphasis added.)

As noted earlier, CGLs were formulated and revised between 1940 and 1973. Risk assessment in pre-1980 CGLs did not incorporate liability under CERCLA. Therefore, potential liability was not spread among polluting insureds. *Whether Insurers Must Defend,* 10 N. Ill. U.L. Rev. at 596; Hapke, *Federal Circuit Court Decisions Contaminate Superfund Policy,* 19 Envtl. L. Rep. 10393 (1989).

tracted for by the parties and that may not be presently quantifiable." *Shorewood School Dist.,* 170 Wis. 2d at 369.

We find no ambiguity in the term "suit" as it has been used in the insurance policies. "Suit" denotes court proceedings, not a "functional equivalent." The dissent believes that a reasonable policyholder would view letters from a federal or state agency advising an insured of liability as a "suit." To the contrary, the word "suit" is easily understood and unambiguous to a reasonable policyholder. The proof is in the decisions that hold that a "PRP letter" is the "functional equivalent of a suit." Either there is a suit or there is not. When there is no suit, there is no duty to defend. Therefore,

> [t]o determine whether a duty to defend exists, the complaint claiming damages must be compared to the insurance policy and a determination made as to whether, if the allegations are proved, the insurer would be required to pay the resulting judgment. The insurer need only look at the allegations within the four corners of the complaint to make such a determination.

*Id.* at 364–65.

Construing either the EPA's PRP letter or the DNR letters as the "functional equivalent of a suit" would be contrary to present Wisconsin insurance law since (a) the insurer would have to look beyond the four corners of the complaint in order to assess whether a potentially covered claim exists, and (b) the insurer would be put in the position of anticipating a coverage expectation for which it did not contract or receive payment. In this case, no complaint has been filed which would initiate a suit and invoke the insurers' duty to

defend.[27] Therefore, no matter how coercive the language of the DNR letter was considered to be, it was used within the realm of an *administrative* proceeding. It did not have the effect of initiating a suit.

### CERCLA SUPERFUND RESPONSE COSTS DO NOT CONSTITUTE DAMAGES

Standard CGL policy language requires a duty to defend a suit seeking damages, which, if proved, would give rise to recovery under the terms and conditions of the policy. *Elliott,* 169 Wis. 2d at 320–21. The insurer has to defend suits against the insured requesting recovery for sums that the insured may become legally obligated to pay *as damages.* The *as damages* qualifier appears in the policies at issue in the bodily injury, property damage, and personal injury coverages. However, contrary to the conclusion of the court of appeals, the CGL policies in this case do not provide coverage for Superfund response costs, since such costs do not constitute damages.[28] Additionally, the parties did not contract for such coverage.

---

[27] *See also Reliance Ins. v. Royal Motorcar Corp.,* 534 So. 2d 922, 923 (Fla. Dist. Ct. App. 1988) (an insurer's duty to defend is determined solely by the complaint's allegations); *American Alliance Ins. v. Frito-Lay,* 788 S.W.2d 152, 153–54 (Tex. Ct. App. 1990) (there must be an examination of the allegations in the complaint to determine if a duty to defend exists); *Viking Ins. Co. of Wisconsin v. Hill,* 57 Wash. App. 341, 787 P.2d 1385 (1990) (the duty to defend is determined by a review of the allegations on the face of the pleading which gave rise to the covered action); and *Grieb v. Citizens Casualty Co.,* 33 Wis. 2d 552, 557, 148 N.W.2d 103 (1967) (whether a third-party suit comes within a defense-coverage clause depends upon the allegations in the complaint).

[28] 42 U.S.C. sec. 9607(a) states in pertinent part:

In *Shorewood School Dist.,* this court stated that " '[d]amages' as used in . . . insurance policies unambiguously means legal damages. It is legal compensation for past wrongs or injuries and is generally pecuniary in nature. The term 'damages' does not encompass the cost of complying with an injunctive decree." *Shorewood School Dist.,* 170 Wis. 2d at 368. Further, this court stated that the

> limited construction of the term 'damages' is consistent with the basic grant of coverage in the

> (4) [A] person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; . . . [and]
>> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release. . . .

It should be noted that the National Contingency Plan is developed under CERCLA by the EPA. The plan establishes procedures for the cleanup of hazardous waste sites.

When dealing with the issue of damages, courts have disagreed as to whether a CGL policy's reference to "damages" includes cleanup costs, such as at issue in this case. Courts which interpret "damages" more broadly conclude that coverage includes claims brought under either sec. 9607(a)(4)(A) or (C). *See* Kristin A. Kolesar, Note, *Insurance Coverage for CERCLA Claims Under Comprehensive General Liability Policies: Cleaning Up Hazardous Waste in the Legal Environment,* 68 Notre Dame L. Rev. 549, 553–54 (1993) [hereinafter *Insurance Coverage for CERCLA Claims*].

insurance policies. The insurers agreed to pay 'all sums which the insured shall become legally obligated to pay *as damages.*' The insurers did not agree to pay '*all sums* which the insured shall become legally obligated to pay.' The addition of 'as damages' serves as a qualifier, a limit to coverage.

*Id.* at 369–70 (emphasis in original). Consistent with conclusions of other courts, this court has concluded that if the term "damages" is given a broader or more expansive interpretation, the phrase "as damages" would be rendered mere surplusage, since any expenses prior or incidental to litigation would be covered by the policies. *Id. See also Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (4th Cir. 1987), *cert. denied* 484 U.S. 1008 (1988) ("[i]f the term 'damages' is given the broad, boundless connotations sought by the [insured], then the term 'damages' in the contract . . . would become mere surplusage, because any obligation to pay would be covered. . . ."); *Continental Ins. v. Northeastern Pharmaceutical,* 842 F.2d 977 (8th Cir. 1988), *cert. denied sub nom. Missouri v. Continental Insurance Cos.,* 488 U.S. 821 (1988) (Northeastern's CGL policies did not provide coverage for reimbursement of response costs under CERCLA; the phrase "as damages" is not ambiguous, since the plain meaning of the term as used in the insurance context refers to legal damages and not equitable monetary relief).

Response costs assigned either under CERCLA or secs. 144.442(8) and (9), Stats., are, by definition, considered to be equitable relief and reflect a congressional intent to differentiate between cleanup or response costs under 42 U.S.C. sec. 9607(a)(4)(A) and damages for injury, destruction, or the loss of natural resources under 42 U.S.C. sec. 9607(a)(4)(C). *See Insurance Coverage for CERCLA Claims,* 68 Notre

Dame L. Rev. at 561. Indeed, the federal government has stated that

> [n]atural resource damage assessments are not identical to response or remedial actions addressed by the larger statutory scheme of CERCLA. . . . Assessments are not intended to replace response actions, which have as their primary purpose the protection of human health, but to supplement them, by providing a process for determining proper compensation to the public for injury to natural resources.

51 Fed. Reg. 27,674 (1986); *Insurance Coverage for CERCLA Claims,* 68 Notre Dame L. Rev. at 561 n.76. Therefore, as an equitable form of relief, response costs were not designed to compensate for past wrongs; rather, they were intended to deter any future contamination by means of injunctive action, while providing for remediation and cleanup of the affected site. This type of relief is distinct from that which is substitutionary—monetary compensation provided to make up for a claimed loss. *Shorewood School Dist.,* 170 Wis. 2d at 369. Although the dissent takes the position that the insurers should be responsible for the response costs, the insurers never assumed a contractual responsibility to pay to remove hazardous materials and to prevent future harm.

Finally, CERCLA expressly permits PRPs to insure against the type of costs imposed under this legislation. 42 U.S.C. sec. 9607(e)(1) states:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to

any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

However, the CGL at issue in this case did not by its terms provide for such coverage. We examine only the terms of the policies for which the parties initially contracted.

■

In conclusion, we hold that General Casualty and Aetna do not have a duty to defend against the actions of the EPA and the DNR, requesting environmental cleanup, because no suit seeking damages has been filed against the insureds. Accordingly, we affirm in part and reverse in part the decision of the court of appeals and remand to the circuit court with directions to deny the motion for summary judgment of the City and ES&G and to enter summary judgment on behalf of General Casualty and Aetna.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part, and the cause is remanded to the circuit court with directions.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* CERCLA environmental clean-up cases involve "one of the largest and most costly areas of civil litigation." 7A Appleman, Insurance Law and Practice, sec. 4520, p. 126 (1993 Supp.). The court's decision determines who will pay the costs of environmental clean-up in Wisconsin—the insureds or the insurance companies. Courts across the country have divided on the complex legal questions behind this very practical problem.

I conclude, as did the circuit court, a unanimous panel of the court of appeals, and the majority of state and federal courts which have decided similar cases[1] that the insureds are covered by the insurance policies. The very well written court of appeals decision, *City of Edgerton v. General Cas. Co.,* 172 Wis. 2d 518, 493 N.W.2d 768 (Ct. App. 1992), carefully reviews the numerous cases and authorities. It does not need to be amplified by this dissent. I write briefly to explain where, in my opinion, the reasoning of the majority opinion falters.

## I.

The majority opinion holds that the insurance company's duty to defend a "suit" arises only on the commencement of an action in a court of law. I conclude that the majority's interpretation of the word "suit" as

---

[1] As I previously stated, the courts are divided. I rely on secondary material for surveys of the federal and state court decisions to determine the majority rule. According to these sources, a slim majority of the courts have held that the policy imposes a duty to defend following receipt of a PRP letter; a larger majority apparently concludes that response costs are damages under the policy. For surveys of the cases, *see, e.g.,* Kenneth H. Mack, *Insurance Coverage of Environmental Claims,* Practicing Law Institute (April–May 1993) at 4 (Westlaw citation: 459 PLI/Lit 261, PLI Order No. H4–5152; Database JLR); Barry R. Ostrager, *Special Insurance Coverage Issues Arising out of Hazardous Waste/Environmental Clean-Up Litigation,* American Law Institute (June 21, 1993) at 25–35, 40–48 (Westlaw citation: C855 ALI–ABA 1005; Database JLR); Mary Kay Vyskocil, *Environmental Coverage Litigation: An Overview of Trends and Developments Practicing Law Institute* (January–February 1993) at 6–11, 18–24 (Westlaw citation: 454 PLI/Lit 443, PLI Order No. H4–5148; Database JLR).

used in the policy is erroneous and that the duty to defend may be prompted by administrative action. Because the majority concludes that "suit" is limited to a court action, I need not address, as did the court of appeals, which step in the administrative process triggers the duty to defend.

First, the majority's interpretation contravenes the general rules applicable to contract interpretation that the objective of interpreting the policy is to ascertain and carry out the intention of the parties. Words in a policy must be given their plain and ordinary meaning; they must be interpreted to mean what a reasonable person in the position of the insured would have understood them to mean.

The majority opinion states in a conclusory fashion that "suit" denotes court proceedings. While one dictionary definition of "suit" is an action in court, the dictionary also gives the word the broader meaning: "the attempt to gain an end by legal process: prosecution of right before any tribunal: litigation." Webster's Third New International Dictionary (1986) 2286.[2]

---

[2] When I examine the dictionary definitions of "process" and "litigation," they too have multiple meanings. "Process" is defined as "the course of the procedure in a judicial action or in a suit in litigation: legal action." Webster's Third New International Dictionary (1986) 1808. "Litigation" is defined as "the practice of taking legal action" and also as "a controversy involving adverse parties before an executive governmental agency having quasi-judicial powers and employing quasi-judicial procedures." Webster's Third New International Dictionary (1986) 1322. While a court would not ordinarily examine a law dictionary, as the majority does, to determine what an objectively reasonable policyholder would have understood the policy to mean, the legal definition of "suit" is similar to Webster's.

Thus suit, according to a dictionary or real life, is not limited to proceedings in court.

While courts frequently duel with dictionary definitions, many of which are circular, the real point is that the dictionaries show multiple meanings for the word "suit" and that a reasonable understanding of the word "suit" is not limited to an action filed in court.

From the point of view of a reasonable policy holder, official letters from a federal or state agency advising an insured of liability, with increasing penalties if the insured does not respond, appear to be an adversary's attempt to gain an end by a legal process. Such administrative proceedings may force the insured to hire technical experts and lawyers to protect its interests and may terminate in an action in court. Thus to the insured an administrative action is as coercive a legal process as an action filed in a court of law.

While the word "suit" may have several meanings, semantics make little difference to an objectively reasonable insured in the face of the myriad types of liability that might result from administrative proceedings. The only meaning of the word "suit" in the insurance policy which comports with an insured's objectively reasonable expectations is that it signifies either a court action or an attempt to gain an end by a legal process.

Second, the majority's narrow interpretation of the word "suit" to mean an action commenced in court is neither reasonable nor wise because it fosters litigation. The policy behind CERCLA is to encourage prompt and voluntary clean-up of toxic waste. The antipollution statutes offer the insured incentives to cooperate with the government rather than awaiting a court proceeding. If, as the majority opinion holds, the administrative action does not activate the duty to

defend, the insured may refuse to cooperate with the government in order to force the government to file a formal complaint. An interpretation of the policy that encourages an insured not to cooperate with governmental agencies and fosters litigation in lieu of alternative dispute resolution is, on its face, unreasonable.

Third, an examination of the statutory proceedings demonstrates that administrative enforcement is part of litigation. The government has discretion about the type of action to use to combat pollution. By choosing a more expensive option the government can adversely affect the insured's rights. Because damages might be determined before the parties ever get to court, the need for representation is thus perhaps greatest at the administrative level and the administrative process is obviously part of the litigation process which triggers the obligation to defend. *Avondale Industries, Inc. v. Travelers Indem. Co.,* 697 F. Supp. 1314, 1320–22 (S.D. N.Y. 1988), *aff'd,* 887 F.2d 1200 (2d Cir. 1989), *reh'g denied,* 894 F.2d 498 (2d Cir. 1990), *cert. denied,* 496 U.S. 906 (1990). *See also, e.g., Lindas v. Cady,* 183 Wis. 2d 547, 559–61, 515 N.W.2d 458 (1994), concluding that unreviewed agency determinations may have preclusive effect in court.

Fourth, according to the majority, because our cases state that a court looks to the complaint to determine whether a potentially covered claim exists, the word "suit" must refer to a lawsuit. Majority opinion at 765, 781. These cases, however, do not have anything to do with the case at bar. In all of them, an action in court was in fact filed. These cases can not be used to say that there is no duty to defend unless an action in court is commenced.

Finally, it seems to me that the majority's interpretation of the word "suit" in the context of an insurer's duty to defend is antiquated. In our modern legal world many forms of liability are determined outside the courtroom. This court has by rule enabled trial courts to resolve disputes without clogging the dockets of our trial and appellate courts. By creating administrative mechanisms to encourage prompt, voluntary, and efficient environmental clean-up, the state and federal legislatures have attempted to solve a major societal problem without resorting to the courts. By clinging to an outmoded definition of the term "suit," the majority defeats this legislative policy.

For the reasons set forth, I agree with the numerous cases holding that when the government assumes an adversarial posture and makes clear that governmental force will be used with probable and imminent financial consequences, a suit is in progress and the insured might reasonably expect the insurance company to defend.

## II.

Although the majority opinion concludes that the insurance company has no obligation at this stage of the administrative proceedings, it nevertheless goes on to hold that response costs do not constitute damages under the policy. I address this damage issue because it is the only damage issue the majority discusses. Again I conclude, as did the circuit court, a unanimous panel of the court of appeals, and the majority of courts that have considered the issue, that response costs are damages under the policy. The majority opinion's interpretation of the word "damages" in the policy relies heavily on *School District of Shorewood v.*

*Wausau Ins. Co.,* 170 Wis. 2d 347, 488 N.W.2d 82 (1992), and is unpersuasive.

First, the majority opinion applies the *Shorewood* discussion of damages to this CERCLA case in a summary fashion, ignoring the language in the *Shorewood* decision by which the court expressly declined to analogize that case to CERCLA cases defining the word "damages." The *Shorewood* court stated: "The issue of whether clean-up costs constitute 'damages' under the terms of an insurance contract has never been addressed by a Wisconsin court. Such an important issue should not be decided in a cursory fashion by this court. Therefore, we decline to adopt or apply the analogy posited by the school districts." *Shorewood,* 170 Wis. 2d at 374.

Second, were the majority opinion to follow the *Shorewood* rationale to its logical conclusion, it would have to hold that the response costs in this case were damages within the meaning of the policy. The *Shorewood* court's dissection of the word "damages" in a comprehensive general liability policy rests on the analysis of "damages" by Professor Dobbs, whom the court characterized as "a noted authority on remedies." *Shorewood,* 170 Wis. 2d at 368. The *Shorewood* court quoted extensively from Professor Dobbs' 1973 Handbook on the Law of Remedies. *Shorewood,* 170 Wis. 2d at 368–69.

In his more recent 1993 revision of his book, Professor Dobbs concludes that response costs under CERCLA cases are "analogous to repair costs and . . .. common law consequential damages. . . . Response costs are very high, but in spite of the terminology, they closely resemble familiar common law types of damages." Handbook on the Law of Remedies 727 (1993). Thus adherence to *Shorewood* and its reliance on Pro-

fessor Dobbs lead to the conclusion that response costs are damages under the standard form policy involved in this case.

For the reasons set forth herein and in the decision of the court of appeals, I dissent.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN and Justice WILLIAM A. BABLITCH join in this dissent.