**PROFESSIONAL RENTAL, INC., Appellant,**

v.

**SHELBY INSURANCE CO., Appellee.**

[Cite as *Professional Rental, Inc. v. Shelby Ins. Co.* (1991), 75 Ohio App.3d 365.]

Court of Appeals of Ohio,
Geauga County.

No. 91–G–1623.

Decided Dec. 16, 1991.

*Joseph R. Znidarsic* and *Paul J. Dolan,* for appellant.

*Robert H. Eddy,* for appellee.

FORD, Presiding Judge.

This appeal emanates from a declaratory judgment action brought by appellant Professional Rental, Inc. ("Professional") against its insurer, appellee Shelby Insurance Company ("Shelby"). In this action, Professional sought a declaration that Shelby was obliged to defend and indemnify it with respect to certain United States Environmental Protection Agency ("EPA") claims. On December 26, 1990, the Geauga County Court of Common Pleas entered judgment in favor of Shelby, concluding that Professional's claims for coverage were premature because Shelby has no duty to defend until the commencement of a "suit" (*i.e.*, lawsuit). Based upon the record in the instant case, the following facts are pertinent to this court's inquiry:

Professional is an Ohio corporation duly authorized to conduct business in Ohio with its principal place of business located in Chardon, Ohio. Shelby has insured Professional during all periods relevant to this appeal.

In January 1980, Professional sold Alvin Laskin, d.b.a. Poplar Oil Company, approximately seventy-five gallons of its waste motor oil for $6. Thereafter, the excess motor oil was transported to the Laskin Poplar Oil Site in Jefferson, Ohio ("Laskin Site"). This single transaction represents Professional's only contribution of waste oil to the Laskin Site.

Between 1980 and 1984, waste from numerous sources was stored at the Laskin Site. Federal and state environmental agencies investigating the Laskin Site detected releases and threatened releases of hazardous waste into the environment. In April 1984, the United States of America filed a civil action against Laskin and eight other defendants in the United States District Court, Northern District of Ohio, Eastern Division. *United States of America v. Laskin*, case No. C84–2035Y. Initially, Professional was not a named party to the lawsuit.

In July 1986, Professional was brought into the *Laskin* lawsuit as a third-party defendant. By correspondence dated July 27, 1987, Professional put Shelby on notice of the pending litigation and made a claim for coverage including defense and indemnification. Shelby denied any obligation to provide Professional with a defense or indemnification under the insurance policy. However, Professional was subsequently dismissed without prejudice from the *Laskin* case on the basis of a settlement with the third-party defendants.

In August 1987, the EPA notified Professional by letter that it was a potentially responsible party ("PRP") under the Comprehensive Environmen-

tal Response, Compensation and Liability Act of 1980 [1] ("CERCLA"), with regard to the Laskin Site. This "PRP notification" requested that Professional voluntarily remedy the situation at the Laskin Site, otherwise the EPA would undertake the remedial action itself and seek reimbursement or other enforcement action as authorized by law. The EPA further requested that Professional enter into settlement negotiations with other PRPs and submit a "good faith" proposal for implementing remedial action at the Laskin Site within sixty days. In closing, the EPA requested information for the purpose of enforcing CERCLA and assisting itself in determining the need for response action.

In April 1989, Professional received another PRP notification from the EPA. The initial language employed by the agency was couched in the same noncompulsory terms as the April 1987 correspondence, *i.e.*, the EPA "encouraged" Professional to make restitution for costs already incurred and to "voluntarily" finance future cleanup costs. However, the letter continued:

" * * * In Accordance with Section 107(a) of CERCLA, *demand* is hereby made for payment of the amount specified * * * plus any and all interest authorized to be recovered under Section 107(A) or under any other provisions of law. *Demand* is also hereby made under these authorities for payment of interest on all future costs that U.S. EPA may accrue in regard to the Site. " * * *

"As a potentially responsible party, you should notify U.S. EPA in writing within 15 calendar days of receipt of this letter of your willingness to participate in negotiating to perform or finance the activities described above. If U.S. EPA does not receive a timely response, U.S. EPA will assume that your organization does not wish to negotiate a resolution of its potential responsibility in connection with the Site and that your organization has declined any involvement in performing the response activities. " * * *

" * * * Upon your receipt of this Special Notice, *you will have a maximum of 60 days to coordinate with any PRPs and to present to U.S. EPA a 'good faith' proposal for implementing and conducting the remedial action proposed in the Proposed Plan.* " * * *

"If a 'good faith' offer is not received within the 60 day period, *no extension* to the 60 days will be granted by U.S. EPA *except in the event that*

---

1. Section 9601, *et seq.*, (1980), as amended by the Superfund Amendment and Reauthorization Act of 1986.

*extraordinary circumstances are demonstrated* by the PRPs in a written request. *If a 'good faith' proposal is not received within 60 calendar days, the U.S. EPA, pursuant to section 122(e)(4), may proceed to undertake such further action as is authorized by law, including implementation of the remedial action utilizing public funds available to the Agency."* (Emphasis added.)

After receiving this EPA correspondence, Professional notified Shelby of the potential liability.

On July 7, 1989, Professional once again received a PRP notification from the EPA. The EPA estimated Professional to be jointly and severally liable for the sum of $3,652,516.05, plus interest for previously incurred costs and demanded payment, stating:

*"Such payment must be made* to the U.S. EPA Hazardous Substances Superfund established pursuant to Section 221 of CERCLA, as amended, which is administered by U.S. EPA. \* \* \*

*"We hereby request that you make restitution by payment of the amount in this letter plus interest, together with any sums hereafter expended by the Agency in connection with the Site* pursuant to authority of CERCLA, as amended. Pursuant to Section 107(a) of CERCLA, as amended, *interest shall begin accruing as of the date of this demand, if payment is not received within thirty (30) days of the date of this letter.*

" \* \* \*

*"If we do not receive a response from you within this time frame,* the U.S. EPA will assume that you have declined to reimburse the Fund for the Site expenditures, and pursuant to CERCLA, as amended, *U.S. EPA may pursue civil litigation against you."* (Emphasis added.)

Professional again notified Shelby of the EPA demands. However, Shelby refused to provide Professional with a defense.

Accordingly, Professional filed the instant declaratory judgment action seeking a declaration that Shelby was obligated to defend and indemnify with respect to the EPA PRP notifications. The parties submitted stipulations, various exhibits, and briefs in lieu of trial. Among these items was a copy of Professional's policy with Shelby, which provided:

"**PART IV—LIABILITY INSURANCE**

"A. **WE WILL PAY**

"1. **We** will pay all sums the **insured** legally must pay as damages because of **bodily injury** or **property damage** to which this insurance applies caused by an **accident** and resulting from **garage operations**.

"2.  **We** have the right and the duty to defend any suit asking for these damages.  However, **we** have no duty to defend suits for **bodily injury** or **property damage** not covered by this policy.  **We** may investigate and settle any claim or suit as **we** consider appropriate.  **Our** payment of the LIABILITY INSURANCE limit ends **our** duty to defend or settle."  (Emphasis in original.)

On December 26, 1990, the trial court granted judgment in favor of Shelby based upon its conclusion that since there was no actual "suit" pending against Professional, Shelby's contractual "duty to defend" had not yet arisen.  In its judgment entry, the court noted:

" * * * There is no 'suit' pending against [Professional] within the meaning of the insurance policies at issue in this case.  Accordingly, the duty to defend, if any, has not been triggered.  Any other or further determination by this Court would be dicta. *[Shelby] has no duty to defend until an actual suit (lawsuit) has been filed against [Professional].  Although all the issues have been exhaustively briefed and argued by counsel, the lack of a lawsuit is dispositive of the case.*  There is no evidence of any failure by [Shelby] to abide by the terms of any applicable policy and [Professional] cannot prevail on its claim in declaratory judgment."  (Emphasis added.)

Professional timely filed its notice of appeal, and now raises the following assignments of error:

"1.  The trial court erred in dismissing Professional Rental's declaratory judgment action because the administrative actions taken by the EPA against Professional Rental constitute a 'suit' triggering Shelby's duty to defend under the insurance policies.

"2.  The trial court erred by dismissing Professional Rental's action for declaratory relief without declaring Professional Rental's rights under the insurance policies."

In the first assignment of error, Professional maintains that the trial court erred in concluding that the EPA notices identifying Professional as a "PRP" and subsequently demanding payment did not constitute a "suit."  Under the policy, Shelby had a duty to defend any "suit" seeking property damages "caused by an accident and resulting from garage operations."  Professional contends that the PRP notifications were substantially equivalent to the commencement of a "suit" seeking damages covered by the policy.[2]

Since the trial court determined that Shelby's duty to defend did not arise until the commencement of a formal lawsuit, the court made no determination

---

2.  The term "suit" is not defined in the policy.

as to the scope of Shelby's duty to indemnify. Based upon the limited extent of the trial court's decision and the argumentation presented on appeal, we will confine our analysis to the narrow issue of whether the PRP notifications amount to a suit giving rise to a duty to defend. Significantly, this issue appears to be one of first impression in Ohio.

## A

When construing insurance contracts, words in the policy must be given their plain and ordinary meaning. *State Farm Auto. Ins. Co. v. Rose* (1991), 61 Ohio St.3d 528, 531, 575 N.E.2d 459, 461. However, where provisions of a contract of insurance are ambiguous and thus susceptible to more than one meaning, they will be construed strictly against the insurer and liberally in favor of the insured. *Id.* at 531–532, 575 N.E.2d at 461–462; *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus.

Webster's Third New International Dictionary (1986) 2286, gives "suit" a meaning Shelby seeks: "an action or process *in a court* for the recovery of a right or claim." (Emphasis added.) *Id.* However, the same dictionary also gives the word a second, broader meaning: "the attempt to gain an end by a legal process." *Id.*

Federal and state courts stand divided on the issue of whether receiving an EPA "PRP" notification equates to the filing of a traditional "suit" (*i.e.*, lawsuit).[3] Similarly, the courts are equally divided on the issue whether a

---

3. Compare, *e.g.*, *Ray Indus., Inc. v. Liberty Mut. Ins. Co.* (E.D.Mich.1989), 728 F.Supp. 1310, 1314 (EPA letter to insured stating that it considered insured a "potentially responsible party" for hazardous contamination and that the agency intended to hold insured liable for at least $37 million in cleanup costs triggered duty to defend); *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.* (E.D.Mich.1987), 662 F.Supp. 71, 75 (a "suit" includes any effort to impose liability ultimately enforceable by a court); *U.S. Fid. & Guar. Co. v. Specialty Coatings Co.* (1989), 180 Ill.App.3d 378, 388–389, 129 Ill.Dec. 306, 394, 535 N.E.2d 1071, 1079 (similar); and *Hazen Paper Co. v. U.S. Fid. & Guar. Co.* (1990), 407 Mass. 689, 696, 555 N.E.2d 576, 581 (consequences of EPA letter "so substantially equivalent" to commencement of suit that duty to defend arises "immediately") with *Technicon Electronics Corp. v. American Home Assur. Co.* (1988), 141 A.D.2d 124, 145–146, 533 N.Y.S.2d 91, 104–105 (PRP letter from EPA to insured informing insured of potential liability under CERCLA and that EPA was interested in discussing insured's participation in remedial measures did not constitute "suit"); *Maryland Cas. Co. v. Armco, Inc.* (C.A.4, 1987), 822 F.2d 1348, 1354 (mere possibility of liability under CERCLA does not trigger duty to defend), certiorari denied (1988), 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654; *Arco Indus. Corp. v. Travelers Ins. Co.* (W.D.Mich.1989), 730 F.Supp. 59, 68 (PRP letter is not the functional equivalent of suit); and *Detrex Chem. Indus., Inc. v. Employers Ins. of Wausau* (N.D.Ohio 1987), 681 F.Supp. 438, 446 (EPA letter informing company that it might be liable for cleanup costs, penalties and punitive damages under CERCLA does not trigger duty to defend).

letter from a state environmental agency is congenerous to a suit.[4]

Upon reviewing authority on both sides of the issue, it is apparent that the term "suit" is susceptible to more than one meaning, and thus should be liberally construed in favor of the insured. See *Rose*, 61 Ohio St.3d at 532, 575 N.E.2d at 461. We do not adopt the bright-line rule set forth in the trial court's judgment entry, linking the obligation to defend to some pending *judicial* proceedings. This court feels compelled to focus more upon the substance rather than form in determining whether the insured was subjected to a "suit" or its functional equivalent within the meaning of the policy. Accordingly, the term "suit," in our judgment, should include substantial efforts which *force* the insured to take action or suffer serious consequences if the insured fails to cooperate.

Our rejection of the bright-line definition of the term "suit" is especially appropriate when dealing with the subject matter involved in the case *sub judice*. The junction where environmental law meets insurance law is an inappropriate place to erect an inflexible rule requiring the initiation of a traditional lawsuit as a condition precedent to the insurer's obligation to defend. See *Ryan v. Royal Ins. Co. of Am.* (C.A.1, 1990), 916 F.2d 731, 740. Accordingly, it is both appropriate and necessary for this court to examine the manner in which the EPA initiates CERCLA enforcement actions in order to determine when a "suit," or its functional equivalent, has arisen.

## B

### CERCLA Enforcement Actions

The CERCLA statutory scheme gives the EPA several legal methods for compelling PRP's to assume responsibility for hazardous waste cleanup. Initially, CERCLA empowers the EPA to "respond" to the actual or threatened release of hazardous substances into the environment. See Section 9604,

---

4. Compare, *e.g., Higgins Indus. Inc. v. Fireman's Fund Ins. Co.* (E.D.Mich.1989), 730 F.Supp. 774, 776 (insurance company must defend all governmental claims and demands in environmental context irrespective of the form the demand takes); *Polkow v. Citizens Ins. Co.* (1989), 180 Mich.App. 651, 657, 447 N.W.2d 853, 856 (state environmental agency letter requiring insured to investigate and remedy contaminated site triggered duty to defend), appeal granted (1990), 435 Mich. 862, 458 N.W.2d 878; and *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng. Co.* (1990), 326 N.C. 133, 153–154, 388 S.E.2d 557, 570 (issuance of state compliance order directing remedial action constituted "suit" within meaning of policies) with *Hazen Paper, supra,* 407 Mass. at 694, 555 N.E.2d at 580 (state environmental agency letter describing extent of release of hazardous materials and ordering removal not equivalent to suit); and *Patrons Oxford Mut. Ins. Co. v. Marois* (Me.1990), 573 A.2d 16, 20 (state environmental agency directive aimed at compelling cleanup not a "suit seeking damages").

Title 42, U.S.Code. The Act then shifts liability for "response costs"[5] to responsible parties, namely, owners and operators of hazardous waste facilities, waste generators, disposers, and transporters. See Section 9607, Title 42, U.S.Code.

The enforcement process includes two primary methods of shifting cleanup responsibility to PRPs: (1) The CERCLA statutory scheme provides for injunctive relief by permitting the EPA to issue an administrative order compelling cleanup or to obtain a court order compelling the same; and (2) CERCLA also allows for restitutional relief by authorizing the EPA to expend funds from the federal Superfund to clean up toxic waste sites and subsequently institute cost recovery actions against responsible parties.

*1. Compelled Cleanup Actions:* Initially, the EPA encourages voluntary participation in the cleanup efforts through the issuance of a "PRP notification," discussed *infra.* If the PRP does not respond to this invitation, CERCLA Section 106(a) authorizes the EPA to issue an *administrative order* to compel a responsible party to clean up a site. The EPA usually first attempts to negotiate the administrative order with the PRP. If the EPA chooses to negotiate and is successful, the agreement is bound in a *consent order.* However, if negotiations fail, the EPA may *unilaterally* develop the administrative order. The issuance of this order tends to accelerate participation, as a failure to comply could subject the PRP to a fine of $25,000 "for each day in which such violation occurs or such failure to comply continues." Section 9606(b)(1), Title 42, U.S.Code.

Section 106(a) also authorizes the EPA to seek an *injunctive order.* The EPA, through the Department of Justice, may file in federal district court to compel PRP cleanup under CERCLA.

Whether the remedy sought by the EPA is administrative or judicial, the purpose of enforcement actions taken pursuant to CERCLA Section 106(a) is to get the PRPs to take the lead in site cleanup operations.

*2. Cost Recovery Actions:* The EPA may decide to clean up first and ask questions later. In other words, if the PRP chooses not to participate in the cleanup operations (or simply fails to respond to the PRP notifications), CERCLA empowers the federal government to use Superfund money to clean up a site and seek reimbursement later from *any* responsible party it can locate. See Sections 9604(a)(1) and 9607(a), Title 42 U.S.Code. If, during the process of cleanup, the EPA issued an *"information-gathering" administrative order* under CERCLA Section 104(e), the failure of a PRP to abide could

---

5. Defined in Sections 9601(23) through 9601(25), Title 42, U.S. Code.

subject the party to treble damages. See Section 9607(c)(3), Title 42, U.S.Code.

In either case, whether the EPA attempts to compel cleanup or seeks reimbursement, once the agency notifies a party of its potential liability, the PRP is faced with three alternatives: (1) engage in a voluntary settlement; (2) force the government to order cleanup; or (3) have the government unilaterally implement cleanup and litigate for reimbursement later.

## C

### The Effect of PRP Notifications

Generally, the EPA's first move is to issue administrative notices to one or more PRPs to initiate the settlement process. Section 9622(e), Title 42, U.S.Code.[6] These "PRP notifications" serve to inform parties about their potential liability for response costs under CERCLA Section 107, define the scope of potential liability, explain why they have been identified as PRPs, and begin the exchange of information and negotiation. The EPA's policy is to send PRP notifications as early as possible in the cleanup process so that PRPs may gather information about their potential liability and have sufficient time to conduct or finance a response action.[7]

The CERCLA notification process is clearly not analogous to the traditional means of bargaining and settlement. "Settling" with the EPA primarily involves formulating an acceptable proposal for cleaning up the pollution under the assumption of PRP liability.[8] Although the EPA designates recipients as "potentially responsible parties," it is not the equivalent of a conventional demand letter or a simple accusation of fault. First, PRP notifications are sent after the EPA has established that "there is sufficient evidence to make a preliminary determination of potential liability under section 107 of CERCLA." Superfund Program, *supra*, 53 F.R. at 5301. Second, parties who are simply "identified" as responsible under Section 107(a) are strictly liable, regardless of fault. The only defense (other than an act of God or war) is the limited defense of "due care" provided in CERCLA Section 107(c)(3),

---

**6.** "[I]t is Agency policy to seek, whenever possible, cleanup by responsible parties prior to recourse to either the Fund [*i.e.*, Superfund] or litigation. To this end EPA may, whenever possible, provide notice to potentially responsible parties and an opportunity to confer with the Agency in an effort to develop a satisfactory cleanup agreement." 47 F.R. 20664, 20665 (1982).

**7.** See Superfund Program: Notice Letters, Negotiations and Information Exchange (1988), 53 F.R. 5298–5301.

**8.** Note, Whether Insurers Must Defend PRP Notifications: An Expensive Issue Complicated by Conflicting Court Decisions (1990), 10 N.Ill.L.Rev. 579, 590.

which allows a defendant to escape liability only in instances where the release or threatened release of hazardous substance was caused by:

"(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant * * *, if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, * * * and (b) he took precautions against foreseeable acts or omissions of any such third party * * *."

The EPA's initial PRP correspondence typically requests information from the PRP for the purpose of assisting the EPA in determining the need for response action. The EPA further requests that the PRP inform the government of its willingness to "voluntarily" participate in cleanup plans by submitting (within sixty days) a "good faith" proposal for implementing and conducting remedial action. See Section 9622, Title 42, U.S. Code.

If the PRP chooses not to respond to the initial PRP letter, the EPA will take one of several steps: (1) seek an injunction in district court forcing the PRP to act; (2) issue a Section 104(e) or 106(a) administrative order either demanding information or forcing PRP cleanup[9]; or (3) send additional notice letters, known colloquially as "drop dead" letters, informing the PRP's that they must follow the EPA's suggested cleanup "voluntarily"—otherwise, the government will expurgate the pollution itself, and thereafter demand reimbursement through a CERCLA Section 107 cost recovery action.

The EPA's strategy is confrontational, and seemingly coercive, as identified PRPs must either abide by what the EPA desires or the agency may clean up the pollution itself, typically at a higher cost.[10] By sending a PRP notification, "the agency in effect has issued an ultimatum of 'settle on the government's terms or litigate and lose.' "[11]

Nevertheless, receiving a PRP notification, *by itself,* does not impose liability. Moreover, failing to respond to a PRP notification does not, *by itself,* authorize the EPA to assess fines or provide a basis for punitive damages. Rather, it is necessary for the EPA to do "something more" in order to *force* or *compel* the insured to take action or suffer serious conse-

---

9. Once again, violations of these orders could subject the PRP to treble damages (Section 9607[c][3]) or $25,000 for each day of noncompliance (Section 9606[b][1]).

10. See Cassel, Negotiating Better Superfund Settlements: Prospects and Protocols (1989), 16 Pepperdine L.Rev. S117, S135.

11. Roberts, Allocation of Liability Under CERCLA: A "Carrot and Stick" Formula (1987), 14 Ecology L.Q. 601, 609.

quences. The "something more" is present when the EPA issues an *administrative order*, pursuant to CERCLA Sections 106(a) or 104(e), making the PRP susceptible to stiff fines or punitive damages for failure to abide by the terms of the order. Moreover, the same degree of compulsion is present when the EPA seeks an injunctive order in federal district court under CERCLA Section 106(a), or institutes a cost recovery action under CERCLA Section 107.

## D

■ While the EPA has clearly identified Professional as a PRP, and has taken a confrontational and seemingly coercive posture, in our opinion Professional is not faced with the functional equivalent of a "suit." [12] The PRP notifications received by Professional were in essence "claims" of liability and demands for restitution—coupled with threats of unilateral action should Professional fail to participate in remedial action. Specifically, the EPA: (1) notified Professional of its joint and several liability with respect to $3,652,-516.05 expended on the Laskin Site; (2) demanded Professional pay these amounts; (3) threatened unilateral action with respect to future cleanup efforts; and (4) warned that the failure to respond within the time allotted would lead the EPA to pursue civil litigation. These threats, demands, and warnings of unilateral remedial action do not *force* Professional to settle or suffer severe financial repercussions.

■ We recognize that, because environmental liability is strict, receipt of a PRP notification is a seemingly apocryphal event. However, the nature of the *claim* does not change the "PRP notification" into a "suit." Even though CERCLA liability may be strict, it is only when the EPA actually begins to *enforce* that liability against an alleged polluter that the latter will bear the consequences of strict liability. Accordingly, we hold that a "suit" is commenced, for purposes of triggering the insurer's duty to defend, at the moment the EPA issues an administrative order which the PRP is legally obligated to obey, or otherwise attempts to enforce liability through an injunctive action or cost recovery action filed in a court of law. Under such circumstances, the EPA makes it sufficiently clear that the *force* of its powers under CERCLA is being brought to bear in a way that threatens the insured with probable and imminent financial consequences.

Unlike the issuance of an administrative order or the filing of an action, the EPA's PRP notifications in the instant case did not place the insureds under a

---

12. Once again, under our rationale, the functional equivalent of a "suit" would include not only a traditional filing in a court, but also one of the foregoing administrative orders.

compulsion to begin cleanup on the site. Accordingly, appellant's first assignment of error is without merit.

In the second assignment of error, Professional asserts that the trial court erred by "dismissing" the declaratory judgment action without declaring Professional's rights under the insurance policies. This argument is not well taken.

The trial court did not "dismiss" Professional's action for declaratory judgment, but rather entered judgment in favor of Shelby based upon the court's conclusion that Shelby's duty to defend was not triggered in the absence of an actual lawsuit. This declaration set forth a construction of the document which was dispositive of the parties' "rights, status and other legal relations" under the stipulated facts. See R.C. 2721.02 and 2721.03.

What the trial court must do in a declaratory judgment action is to set forth a construction of the document in a way that terminates the *present* controversy between the parties. In the absence of a "suit" under the contract of insurance, the trial court was correct in stating that an interpretation of provisions beyond the duty to defend clause would be dicta under the present facts.

Accordingly, Professional's second assignment of error is without merit.

Based upon the foregoing, the judgment of the trial court is affirmed.

*Judgment affirmed.*

CHRISTLEY and JOSEPH E. MAHONEY, JJ., concur.