# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| GULL INDUSTRIES, INC., | No. 69569-0-I |
| Appellant/Cross Respondent, | |
| v. | |
| STATE FARM FIRE AND CASUALTY COMPANY and TRANSAMERICA INSURANCE GROUP, | |
| Respondents/Cross Appellants, | |
| ALLIANZ UNDERWRITERS INSURANCE COMPANY; AMERICAN ECONOMY INSURANCE COMPANY; AMERICAN STATES INSURANCE COMPANY (successor to WESTERN CASUALTY and SURETY COMPANY); CHICAGO INSURANCE COMPANY; COLUMBIA CASUALTY COMPANY; FEDERAL INSURANCE COMPANY; FIREMAN'S FUND INSURANCE COMPANY; GENERAL INSURANCE COMPANY OF AMERICA; GRANITE STATE INSURANCE COMPANY; INDIANA INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; PA; NORTH PACIFIC INSURANCE COMPANY; OHIO CASUALTY INSURANCE COMPANY; PACIFIC INDEMNITY COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; UNITED STATES FIDELITY & GUARANTY COMPANY; WESTPORT INSURANCE CORPORATION; and ZURICH-AMERICAN INSURANCE COMPANY, | PUBLISHED OPINION FILED: June 2, 2014 |
| Defendants. | |

COURT OF APPEALS DIV I STATE OF WASHINGTON FILED 2014 JUN -2 AM 11: 48

VERELLEN, A.C.J. — The Model Toxics Control Act (MTCA), chapter 70.105D RCW, imposes strict liability upon the owner or operator of contaminated property. Such strict liability may trigger the duty to indemnify under commercial liability policies even if no agency has taken or overtly threatened formal legal action.[1] We are asked to decide what triggers a duty to defend "any suit" when the owner of contaminated property faces strict liability under the MTCA. We conclude that the term "suit" is ambiguous in this context and does not require that a summons and complaint be filed or served or that an administrative action be commenced. Rather, under a functional equivalent standard, the duty to defend is triggered if a government agency communicates an explicit or implicit threat of immediate and severe consequences by reason of the contamination.

The Department of Ecology (DOE) letter to Gull Industries Inc. acknowledged receipt of Gull's voluntary report of contamination and intent to remediate. The letter did not communicate any explicit or implicit threat of immediate and severe consequences. Therefore, we affirm the partial summary judgment that State Farm Fire and Casualty Company and Transamerica Insurance Group (TIG) have no duty to defend.

We reject TIG's challenge to the trial court's CR 54(b) designation.

## FACTS

Gull owned a gas station in Sedro-Woolley. To insure itself against liability arising from the operation of this station, Gull obtained liability coverage with TIG for both bodily injury and property damage from 1981 until 1986.

---

[1] Weyerhaeuser Co. v. Aetna Cas. & Sur. Co., 123 Wn.2d 891, 896-97, 874 P.2d 142 (1994).

Gull leased the Sedro-Woolley station to Hayes Johnson and Mary Johnson from 1972 to 1982. Under the terms of the lease, the Johnsons were required to obtain liability insurance to cover the service station's operations. The Johnsons obtained coverage from State Farm from July 28, 1977 through July 28, 1978 under policy number 98-59-34-77. The Johnsons then obtained another policy through State Farm under policy number 98-60-04-39, which covered the period from July 28, 1978 through July 28, 1981. But this second policy was immediately cancelled, and the cancellation request was processed on August 4, 1978. Gull and State Farm dispute whether the Johnsons renewed that policy with State Farm.[2]

Here, the reconstructed insurance policies at issue include the duty to defend against a "suit."[3] First, the parties agree that the State Farm policies stated:

> This Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, arising out of service station operations; and this Company shall have the right and the duty to defend *any suit* against the Insured seeking damages payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but this Company may make such investigation and settlement of any claim or suit as it deems expedient.[4]

Similarly, the TIG policies stated:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an

---

[2] State Farm argues that the second policy was in effect only 17 days after its cancellation, providing coverage through August 21, 1978, but not through July 1981.

[3] Because of the amount of time that has passed since these policies were issued, original copies are no longer available. However, the parties have agreed as to the likely original contract language. The language for the State Farm policy comes from a "Service Station Policy" and for the TIG policy comes from a "Blanket General Liability" policy. Clerk's Papers at 112, 161.

[4] Id. at 119 (emphasis added).

3

occurrence. The company shall have the right and duty to defend *any suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.[5]

None of the policies defined the term "suit."[6]

In 1984, Gull investigated underground storage tanks at a number of Gull's service stations. The investigation at the Sedro-Woolley station identified hydrocarbons in the soil adjacent to the underground storage tanks and revealed a continuous release of hydrocarbons during the period the Johnsons leased the station. As a result, Gull undertook voluntary remediation, including investigation and cleanup of the soil and groundwater.

In 2005, Gull notified DOE that there had been a release of petroleum product at the Sedro-Woolley station. DOE sent Gull a letter acknowledging Gull's notice of the suspected contamination.

In 2009, Gull tendered its claims for defense and indemnification for the costs of the cleanup at the Sedro-Woolley station to TIG. TIG did not accept Gull's tender. In

---

[5] Id. at 161 (emphasis added).

[6] Older standard comprehensive general liability (CGL) policies often failed to define "suit." See Weyerhaeuser, 123 Wn.2d at 902; see also Mark S. Dennison, *What Constitutes "Suit" Triggering Insurer's Duty To Defend Environmental Claims—State Cases*, 48 A.L.R.5th 355, § 2[a] (1997) (explaining that prior to the passage of pollution control laws, insurance companies did not define the term "suit" because there was no dispute over that term's meaning; it was generally understood that a "suit" was initiated with the traditional summons and complaint). A standard form CGL policy introduced in 1987 includes a definition of "suit" in the duty to defend provision. Jennifer Buse, Note, *CERCLA Cost Recovery Suits: A Suit against an Insured for Damages under a Comprehensive General Liability Policy*, 14 WM. MITCHELL L. REV. 829, 845 n.108 (1988). We do not address the impact of CGL policies that include an express definition of "suit."

March 2010, Gull tendered its claims as an additional insured under the Johnsons' policy to State Farm. State Farm did not accept Gull's tender.

Gull then sued TIG, State Farm, and 5 other insurers in Skagit County, asserting claims for declaratory judgment, breach of contract, breach of fiduciary duty, and bad faith relating to the Sedro-Woolley site. It also commenced a lawsuit in King County asserting claims for declaratory relief and damages against 19 insurance companies in connection with over 200 sites across Washington. In May 2012, these lawsuits were consolidated in King County.

State Farm moved for partial summary judgment, arguing, in part, that it had no duty to defend. TIG joined State Farm's motion on that issue. Gull opposed the motion, arguing that the duty to defend was triggered because it faced strict liability for environmental cleanup costs under the MTCA. The trial court granted State Farm and TIG's motion, concluding they have no duty to defend Gull. Gull appeals.

The trial court entered a CR 54(b) designation that there is no just cause for delay and directed the entry of a final judgment. TIG cross appeals the trial court's CR 54(b) ruling.[7]

## DECISION

Gull contends that because the MTCA imposes strict liability, the duty to defend should arise whether or not an agency has sent any communications about the statute or cleanup obligations. It argues that this approach would be consistent with the Washington State Supreme Court decision in Weyerhaeuser Co. v. Aetna Casualty &

---

[7] State Farm cross appealed, but the parties have advised the court that the issues raised in the cross appeal have been settled.

Surety Co. that the duty to indemnify may flow from such strict liability.[8] But there is no compelling authority that supports such an absolute duty to defend standard. As expressly recognized in Weyerhaeuser, the duty to defend analysis is completely independent of the duty to indemnify.[9] We reject Gull's proposed standard.

This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court.[10] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[11] All facts and reasonable inferences are considered in the light most favorable to the nonmoving party, and summary judgment is appropriate only if, from all the evidence, reasonable persons could reach but one conclusion.[12]

"Courts construe insurance policies as contracts."[13] The court must examine the policy as a whole in determining the meaning of a particular term.[14] A trial court must enforce the policy as written if the language is clear and unambiguous, and it may not create an ambiguity where none exists.[15] "If terms are defined in a policy, then the term

---

[8] 123 Wn.2d 891, 874 P.2d 142 (1994).

[9] Id. at 902.

[10] Hadley v. Maxwell, 144 Wn.2d 306, 310, 27 P.3d 600 (2001).

[11] Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wn.2d 16, 26, 109 P.3d 805 (2005) (quoting CR 56(c)).

[12] Id.

[13] Austl. Unlimited, Inc. v. Hartford Cas. Ins. Co., 147 Wn. App. 758, 765, 198 P.3d 514 (2008).

[14] Polygon Nw. Co. v. Am. Nat'l Fire Ins. Co., 143 Wn. App. 753, 785, 189 P.3d 777 (2008).

[15] Quadrant Corp. v. Am. States Ins. Co., 154 Wn.2d 165, 171, 110 P.3d 733 (2005).

should be interpreted in accordance with that policy definition."[16] If policy terms are not defined, then they are to be given their "'plain, ordinary, and popular'" meaning.[17]

Language in an insurance policy is ambiguous if susceptible of two different but reasonable interpretations.[18] Ambiguous policy language must be liberally construed in the insured's favor.[19] "But a court may not give an insurance contract a 'strained or forced construction which would lead to an extension or restriction of the policy beyond what is fairly within its terms.'"[20] The interpretation of an insurance contract is a question of law.[21] We review questions of law de novo.[22]

The MTCA compels a potentially liable person (PLP) to address environmental contamination through strict joint and several liability provisions, regardless of fault or intent.[23] Under the MTCA, DOE identifies hazardous waste sites and either requires PLPs to clean up the waste or undertakes the cleanup itself and seeks reimbursement

---

[16] Kitsap County v. Allstate Ins. Co., 136 Wn.2d 567, 576, 964 P.2d 1173 (1998).

[17] Id. (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d 507 (1990)).

[18] McAllister v. Agora Syndicate, Inc., 103 Wn. App. 106, 109, 11 P.3d 859 (2000).

[19] Id.

[20] Id. (internal quotation marks omitted) (quoting Tewell, Thorpe & Findlay, Inc. v. Cont'l Cas. Co., 64 Wn. App. 571, 576, 825 P.2d 724 (1992)).

[21] State Farm Gen. Ins. Co. v. Emerson, 102 Wn.2d 477, 480, 687 P.2d 1139 (1984).

[22] Mains Farm Homeowners Ass'n v. Worthington, 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

[23] RCW 70.105D.040. The federal equivalent of the MTCA, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675, refers to a "potentially responsible party" (PRP), which is the equivalent of a PLP under state law. The MTCA is "heavily patterned" after CERCLA. Taliesen Corp. v. Razore Land Co., 135 Wn. App. 106, 127, 144 P.3d 1185 (2006).

from the PLPs.[24] DOE may issue a formal letter to a PLP outlining specific requirements for cleanup.[25] A PLP who refuses to comply with an order compelling cleanup is liable for up to three times the cleanup costs incurred by DOE and a daily civil penalty.[26]

After the passage of the MTCA and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (the federal equivalent of the MTCA), 42 U.S.C. §§ 9601-9675, insureds began to seek reimbursement from insurance companies for costs expended in order to comply with these laws.[27] Historically, comprehensive general liability (CGL) policies did not specifically address coverage for property damage or defense costs incurred as a result of strict liability under environmental laws.[28] As a result, courts around the country have had to address whether the strict liability imposed by environmental laws is sufficient to trigger indemnification and defense coverage under these policies.

In Weyerhaeuser, the Washington State Supreme Court addressed whether an insured could seek indemnification coverage for costs expended to clean up contaminated property under the MTCA, even where DOE made no overt threat of

---

[24] RCW 70.105D.020(26) (defining "potentially liable person" as a person found liable by "credible evidence" under RCW 70.105D.040), .030-.050 (outlining government's jurisdiction for investigation, cleanup, and enforcement and the property owner's liability).

[25] The federal Environmental Protection Agency (EPA) issues PRP letters that similarly explain why the party is a PRP, outline the potential liability under CERCLA, begin an exchange of information, invite voluntary cleanup before administrative enforcement, and facilitate negotiation of a settlement agreement. Dennison, supra, § 2[a].

[26] RCW 70.105D.050(1).

[27] Dennison, supra, § 2[a].

[28] Id.

formal legal action, such as a suit in court or issuance of a PLP letter.[29] Weyerhaeuser filed a declaratory judgment action against its insurers, seeking a declaration of indemnity coverage for cleanup expenses at dozens of polluted sites.[30] The policies provided indemnification for all sums that the insured was obligated to pay by reason of the liability imposed by law for damages to property.[31] They did not require a "suit" in order for coverage to attach.[32]

The insurers argued that there must be an adversarial proceeding, or at least the threat of such a proceeding, before indemnification coverage exists.[33] But the Supreme Court concluded that nothing in the language of the insurance policy required a "claim" or an overt threat of action before the insured became legally obligated to comply with the mandatory provisions of the environmental statute.[34] Characterizing this argument as an attempt to add language to the policies, the court noted that if the insurers intended to provide coverage only if there were a lawsuit or the threat of a lawsuit, they could have written policy language to reach that result.[35] Furthermore, the Supreme Court reasoned that requiring a lawsuit or an overt threat of legal action would discourage parties subject to the MTCA to begin remedial action until formal enforcement by DOE so that the costs would be covered by insurance.[36] The effect of

---

[29] Weyerhaeuser, 123 Wn.2d at 896.

[30] Id. at 893.

[31] Id. at 896-97.

[32] Id. at 902.

[33] Id. at 899.

[34] Id. at 913.

[35] Id.

[36] Id. at 907-08.

such an outcome would be to "dramatically slow the progress of hazardous waste cleanup in Washington."[37]

As in the commercial liability policies at issue here, many CGL policies recite the duty to defend "any suit" without including any definition or description of what constitutes a "suit."[38] Washington courts have not yet addressed the issue of what constitutes a "suit" for the purpose of triggering the insurer's duty to defend environmental liability claims against the insured. Nationally, whether administrative actions that fall short of an actual lawsuit constitute a "suit" triggering the insurer's duty to defend environmental claims is a vigorously contested issue.[39]

Some courts have adopted a narrow construction of the term "suit" as used in CGL insurance policies, requiring that a formal complaint be filed against the insured in a court of law in order to trigger the duty to defend.[40] Under this approach, the term "suit" is deemed unambiguous: if no complaint has been filed, there is no "suit" and the insurer has no duty to defend.[41]

---

[37] Id. at 908.

[38] See supra note 6.

[39] Dennison, supra, note 6.

[40] Id. § 3.

[41] See Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co., 18 Cal. 4th 857, 869 n.6, 959 P.2d 265, 77 Cal. Rptr. 2d 107 (1998) (citing Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co., 166 Ill. 2d 520, 655 N.E.2d 842, 847-48, 211 Ill. Dec. 459 (1995) ("suit" in an all risks policy clearly and unambiguously refers to a court proceeding so there is no duty to defend environmental agency letters and proposed consent decree); Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16, 20 (Me. 1990) (administrative proceeding is not a "suit"); Technicon Elecs. Corp. v. Amer. Home Assur. Co., 141 A.D.2d 124,145-46, 533 N.Y.S.2d 91 (1988) (in dicta states that PRP letter does not constitute a "suit"); Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 713-14 (8th Cir. 1992) (EPA demand is not a suit for damages under Missouri law)).

Other courts have adopted a broader construction of the term "suit" and concluded that the issuance of a potentially responsible party (PRP)[42] letter to an insured is the functional equivalent of a suit, triggering the duty to defend.[43] These courts reason that given the strict liability imposed under the environmental laws, the term "suit" is ambiguous in this context and may include administrative actions that do not rise to the level of an actual lawsuit.[44] These cases focus on the devastating financial consequences if a PRP fails to cooperate with the government cleanup effort, making a lawsuit unnecessary to compel compliance with any cleanup orders.[45]

Finally, some courts have held that whether a "suit" exists depends on the coerciveness of the specific regulatory action taken by the government.[46] These courts

---

[42] See supra note 23.

[43] Dennison, supra, §§ 4, 5[a].

[44] See Foster-Gardner, 18 Cal. 4th at 871-73 & n.7 (citing SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 315 (Minn.1995) ("suit" includes a request for information), overruled on other grounds by Bahr v. Boise Cascade Corp., 766 N.W.2d 910 (Minn. 2009); Coakley v. Me. Bonding & Cas. Co., 136 N.H. 402, 417-18, 618 A.2d 777 (1992) (PRP notice and state agency administrative order are a "suit"); C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g. Co., 326 N.C. 133, 154, 388 S.E.2d 557 (1990) (compliance orders were an attempt by the State to gain an end by legal process and hence were "suits"); Avondale Indus., Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1206 (2d Cir. 1989) (under New York law, demand letter from administrative agency is a "suit"); Morrisville Water & Light Dep't v. U.S. States Fid. & Guar. Co., 775 F. Supp. 718, 731-32 (D. Vt. 1991) (PRP letter from the EPA is a "suit" under Vermont law)).

[45] Dennison, supra, § 2[a].

[46] See Foster-Gardner, 18 Cal. 4th at 871-72 & n.8 (citing Hazen Paper Co. v. U.S. Fid. & Guar. Co., 407 Mass. 689, 694-97, 555 N.E.2d 576 (1990) ("[t]he consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately"; no such duty arose as to a different agency letter because it "does not allege the occurrence of any damage that falls within the policy coverage"); Prof'l Rental, Inc. v. Shelby Ins. Co., 75 Ohio App. 3d 365, 372, 599 N.E.2d 423 (1991) ("suit" includes "substantial efforts which force the insured to take action or suffer serious consequences if the insured fails to

also conclude that the term "suit" is ambiguous.[47] As an example of this approach, in Ryan v. Royal Insurance Co. of America, the First Circuit Court of Appeals considered whether government correspondence that was not a PRP letter could trigger the duty to defend.[48] There, Ryan received several letters from the New York Department of Environmental Conservation (NYDEC) after reporting groundwater contamination on his property.[49] The first letter stated that federal law required correction of hazardous waste contamination, that the United States Environmental Protection Agency (EPA) retains primary responsibility for the implementation of the corrective action provision, and it elaborated on the kinds of corrective activities usually required in EPA consent orders.[50] NYDEC indicated that it would place the contaminated site on an informational listing of all sites known or suspected to contain hazardous wastes and that the state Superfund program would address the site if the EPA did not do so.[51] The letter further explained what the state Superfund program customarily entailed, remarked on deficiencies in the site assessment report submitted by Ryan, and requested Ryan to submit plans for any proposed remedial work.[52] In two subsequent letters, NYDEC first advised Ryan of the

---

cooperate"); Hartford Accident & Indem. Co. v. Dana Corp., 690 N.E.2d 285, 296-97 (Ind. Ct. App. 1997) ("coercive and adversarial administrative proceedings" are "suits," but less coercive actions such as "mere notification or investigation when no enforcement action is contemplated" are not "suits"); Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 741 (1st Cir. 1990) (potential liability alone, without any adversarial or coercive action by an administrative agency, is not a "suit")).

[47] Foster-Gardner, 18 Cal. 4th at 872-73.

[48] 916 F.2d 731 (1st Cir. 1990).

[49] Id. at 732.

[50] Id.

[51] Id.

[52] Id.

need to submit a complete closure plan and thereafter told Ryan that NYDEC would likely not pursue certain treatment, storage, and disposal violations at the site if Ryan accomplished closure in an approved manner.[53]

The First Circuit concluded that potential liability alone, without any adversarial or coercive action by an administrative agency, did not constitute a "suit" under the insurance policy.[54] Although a lawsuit need not be commenced in order to constitute a "suit," there must be more than an invitation to initiate cleanup in order to trigger the insurer's duty to defend.[55] The court held that the correspondence from NYDEC did not indicate "coerciveness or a serious state enforcement effort" and could not "realistically be termed adversarial."[56] It rejected Ryan's argument that strict liability under an environmental statute constituted a "suit":

> Even though environmental liability may be strict, it is only when the government actually purposes to enforce the law against a property owner that the latter will bear the consequences of strict liability. If the government decides for any reason (e.g., shortage of funds) not to pursue public rights, the property owner will avoid liability, no matter how dim his prospects on the law and the facts. Thus, absent serious pursuit of the public interest by the agency charged—what the district court, and other authorities, term "adversariness"—the factual expectancy of liability is too low to satisfy either the principle of indemnity or any plausible construction of the policy language.[57]

We conclude that the undefined term "suit" is ambiguous in the environmental liability context and may include administrative enforcement acts that are the functional equivalent of a suit. This is consistent with the Weyerhaeuser court's acknowledgment

---

[53] Id.

[54] Id. at 741.

[55] Id.

[56] Id. at 741-42.

[57] Id. at 742.

that "[i]nsurance coverage in the environmental claims area may be quite different than in other insurance settings" because "[e]nvironmental statutes impose liability, often without fault, on polluters in order to safeguard society in general."[58] It makes no difference whether an insured voluntarily cleans up contamination or waits until after government intervention—it is liable either way.[59] For this reason, a strict reading of "suit" is not appropriate here.

We do not agree with Gull's contention that liability under the MTCA alone, without any direct enforcement action by DOE, is the functional equivalent of a suit for the purposes of the duty to defend. Instead, we adopt the analysis outlined in Ryan and hold that an agency action must be adversarial or coercive in nature in order to qualify as the functional equivalent of a "suit."

Here, the only communication Gull received was a letter from DOE acknowledging receipt of Gull's notice that the property was contaminated and that it intended to pursue an independent voluntary cleanup. DOE gave notice to Gull that Gull's report reveals the soil and groundwater are above the MTCA "Method A Cleanup levels" and that DOE placed the property on the leaking underground storage tank list with an "Awaiting Cleanup" status.[60] The letter also advised Gull to "be aware that there are requirements in state law which must be adhered to" but did not advise of any consequences that might attach to the failure to adhere to those requirements.[61] The

---

[58] Weyerhaeuser, 123 Wn.2d at 909.

[59] Id. at 909-10 (quoting 1 TOD I. ZUCKERMAN & MARK C. RASKOFF, ENVIRONMENTAL INSURANCE LITIGATION § 3.02, at 3-8 (1992)).

[60] Clerk's Papers at 142.

[61] Id. at 143.

letter expressly indicated DOE has not determined that Gull is a PLP and does not imply that DOE "has formally reviewed and approved of the remedial action" planned by Gull.[62] Finally, the letter explains that Gull "may request assistance from Ecology under the Voluntary Cleanup Program," which was "established in response to the public's need for Ecology to provide formal, detailed guidance to parties conducting independent cleanups, and to more readily review cleanup actions undertaken."[63] The letter did not present an express or implied threat of immediate and severe consequences by reason of the contamination.[64] Therefore, consistent with Ryan, Gull has not met its burden on summary judgment to establish there is the functional equivalent of a "suit" here, triggering the duty to defend.

Gull and DOE argue that interpreting the term "suit" to exclude voluntary remediation by an insured who is liable under the MTCA but not yet subject to formal enforcement action by DOE will destroy any incentive for property owners to voluntarily remediate, contrary to the policy concerns addressed in Weyerhaeuser. The public policies addressed in Weyerhaeuser are compelling. But such policy concerns have limited significance in a duty to defend analysis.[65] "[T]his is very much a secondary reason—no court has ever held that it was the primary reason" for finding a duty to defend.[66] Under the language of these policies, the public policy of promoting voluntary

---

[62] Id. at 142.

[63] Id. at 143.

[64] See Ryan, 916 F.2d at 742.

[65] See 2 TOD I. ZUCKERMAN, ENVIRONMENTAL INSURANCE LITIGATION § 12:34 (2d ed. 2013).

[66] Id.

cleanups alone does not compel an automatic duty to defend; the duty to defend is triggered by the functional equivalent of a lawsuit.

Gull's remaining arguments are not persuasive. Gull argues that United States v. Atlantic Research Corp.[67] supports finding a "suit" here. There, the United States Supreme Court considered whether CERCLA allows PRPs with a cause of action to recover costs from other PRPs in the absence of formal litigation.[68] But that was a contribution case that did not address the meaning of "suit" in a duty to defend clause. Therefore, it is not helpful here.

Gull argues that there should be a duty to defend because insureds need insurance proceeds to help pay for the necessary first step of investigation. But Gull cites no authority that the construction of an insurance policy turns on the needs of an insured.

Gull argues that "suit" should not be given a "technical" or "lawyerly" definition[69] and that the average policyholder does not distinguish between being forced to pay legal and other "defense" costs as a result of actual coercive action from a government agency, as opposed to the implicit threat of such action under the MTCA. But the duty to defend implies the necessity to "defend" against something. In the face of no adversarial or coercive interaction whatsoever, an average policyholder would not likely believe such a duty was triggered.

Because DOE did not communicate an explicit or implicit threat of immediate and severe consequences by reason of the contamination of the Sedro-Woolley site, Gull

---

[67] 551 U.S. 128, 127 S. Ct. 2331, 168 L. Ed. 2d 28 (2007).

[68] Id. at 131.

[69] Appellant's Opening Br. at 27-31.

was not faced with the functional equivalent of a suit. TIG and State Farm had no duty to defend.

TIG contends that the trial court abused its discretion in granting Gull's motion for a CR 54(b) designation. We disagree.

CR 54(b) makes an immediate appeal available in situations in which it could be unjust to delay entering a judgment on a distinctly separate claim until the entire case has been finally adjudicated.[70] Four elements are required for a CR 54(b) final judgment: "'(1) more than one claim for relief or more than one party against whom relief is sought; (2) an express determination that there is no just reason for delay; (3) written findings supporting the determination that there is no just reason for delay; and (4) an express direction for entry of the judgment.'"[71]

In determining whether there is no just reason for delay, the trial court should consider the following five factors:

"(1) [T]he relationship between the adjudicated and the unadjudicated claims, (2) whether questions which would be reviewed on appeal are still before the trial court for determination in the unadjudicated portion of the case, (3) whether it is likely that the need for review may be mooted by future developments in the trial court, (4) whether an immediate appeal will delay the trial of the unadjudicated matters without gaining any offsetting advantage in terms of the simplification and facilitation of that trial, and (5) the practical effects of allowing an immediate appeal."[72]

Essential to whether CR 54(b) certification should be granted is whether waiting for final judgment on all the claims or parties will expose the appellant to some danger of

---

[70] Doerflinger v. N.Y. Life Ins. Co., 88 Wn.2d 878, 880, 567 P.2d 230 (1977).

[71] Hulbert v. Port of Everett, 159 Wn. App. 389, 405-06, 245 P.3d 779 (2011) (internal quotation marks omitted) (quoting Fluor Enters., Inc. v. Walter Constr., Ltd., 141 Wn. App. 761, 766-67, 172 P.3d 368 (2007)).

[72] Id. at 406 (alteration in original) (internal quotation marks omitted) (quoting Lindsay Credit Corp. v. Skarperud, 33 Wn. App. 766, 772, 657 P.2d 804 (1983)).

hardship or injustice that can be alleviated only through an immediate interlocutory appeal.[73] The decision to enter a judgment under CR 54(b) is reviewed for abuse of discretion.[74]

Here, in support of the CR 54(b) designation, the trial court entered the following findings of fact:

> 7. The Court finds that Gull has asserted more than one claim in this action against more than one party. Gull's Amended Complaint raises multiple claims against all twelve defendants in this case.

> 8. Gull is not seeking a stay of the litigation with respect to any of those claims.

> 9. The Court's Orders Denying State Farm's and TIG's Duty to Defend represent an adjudication of a single issue at a single site, namely, State Farm's and TIG's defense obligation to Gull at the Highway 20 site located in Sedro-Woolley, Washington.

> 10. The Court's decision that State Farm and TIG owe Gull no defense obligation at the Sedro-Woolley Site constitutes a final adjudication on that one issue.

> 11. Gull's remaining claims against all defendants are unaffected by that decision.

> 12. The Court finds that the issue of whether State Farm and TIG owe Gull a duty of defense with respect to environmental contamination at the Sedro-Woolley site is segregable from the other issues in this case and that an immediate appeal of that issue will not prevent the existing litigation from going forward.

> 13. The court finds that an appellate [court] should review the ruling that there is no duty to defend as opposed to a duty to indemnify as outlined in Weyerhaeuser Co. v. Aetna, 123 Wn.2d 891, 874 P.2d 142 (1994) to avoid a lengthy and costly second trial if an appellate court concludes that the court's ruling should be reversed.

---

[73] Doerflinger, 88 Wn.2d at 882; Fox v. Sunmaster Prods., Inc., 115 Wn.2d 498, 503, 798 P.2d 808 (1990); Pepper v. King County, 61 Wn. App. 339, 350, 810 P.2d 527 (1991).

[74] Hulbert, 159 Wn. App. at 404.

14. The Court finds that there is no just reason to delay entry of a final judgment in favor of State Farm and TIG with respect to their duty to defend Gull at the Sedro-Woolley site.[75]

TIG argues that "the trial court's ruling is incomplete until it is applied to the costs that Gull has incurred for Sedro-Woolley," namely, a decision on which costs incurred by Gull are indemnity costs and which costs are duty to defend costs.[76] It argues that such issues are closely intertwined and not separate from the duty to defend issue and, therefore, should not be appealed piecemeal. TIG relies on Doerflinger v. New York Life Insurance Co.[77] There, the Washington State Supreme Court held that where an appellant relies upon nearly identical facts or allegations to establish multiple theories for relief, the multiple claims requirement for CR 54(b) is not met.[78] But here, the duty to defend and the duty to indemnify are independent duties, each requiring the court to analyze separate contractual provisions and separate facts. They are separate claims, and Doerflinger is not applicable.

TIG also argues that Gull did not show any hardship or injustice that this appeal would prevent. The risk of hardship or injustice without an immediate appeal is a critical consideration for a CR 54(b) determination. Normally, a vague assertion of the length and cost of a second trial would be an inadequate basis for certification. But Gull did not make a purely abstract or artificial showing of risk of harm. In its briefing to the trial court, Gull's primary hardship argument focused on the impact of the duty to defend issue on numerous contaminated sites across the state. Given the potential impact of

---

[75] Clerk's Papers at 943-44.

[76] Br. of Respondent TIG at 29.

[77] 88 Wn.2d 878, 567 P.2d 230 (1977).

[78] Id. at 881.

this legal issue on other cases, the risk of hardship or injustice is established. The trial court did not abuse its discretion.

We affirm.

WE CONCUR: